PERRY, J.
Paul Beasley Johnson, a prisoner under sentence of death, appeals a circuit court order denying his second successive motion for postconviction relief, after an evi-dentiary hearing. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.; Fla. R.Crim. P. 3.851. As explained more fully below, the record here is so rife with evidence of previously undisclosed prosecutorial misconduct that we have no choice but to grant relief.
Specifically, we conclude that newly disclosed evidence shows the following. First, after Johnson was arrested and counsel was appointed, the State intentionally induced Johnson to make incriminating statements to a jailhouse informant in violation of Johnson’s right to counsel. Because Johnson’s statements were imper-missibly elicited, the informant’s testimony concerning those statements was inadmissible under United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Second, although the prosecutor at Johnson’s first trial knew that Johnson’s statements were impermissibly elicited and that the informant’s testimony was inadmissible, he knowingly used false testimony and misleading argument to convince the court to admit the testimony. And third, because the informant’s testimony was admitted and then later used at Johnson’s 1988 trial, and because the State has failed to show that this error did not contribute to the jury’s advisory sentences of death, we must vacate the death sentences under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and remand for a new penalty phase proceeding before a new jury.
This result is compelled by the applicable case law of both the United States Supreme Court and this Court. This case law is based on the principle that society’s search for the truth is the polestar that guides all judicial inquiry, and when the State knowingly presents false testimony or misleading argument to the court, the State casts an impenetrable cloud over that polestar. The United States Supreme Court explained as follows: “[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair ... [for it] involve[s] a corruption of the truth-seeking function of the trial process.” United States v. Agurs, 427 U.S. 97, 103-04, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The rationale underlying this principle is timeless:
[I]f a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriv- *54 mg a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured[,] [s]uch a contrivance by a State to procure the conviction and imprisonment of a defendant is ... inconsistent with the rudimentary demands of justice....
Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1985). “The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction [is] implicit in any concept of ordered liberty....” Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In other words, whenever the State seeks to obfuscate the truth-seeking function of a court by knowingly using false testimony or misleading argument, the integrity of the judicial proceeding is placed in jeopardy.[1]
The reversal of the death sentences in this ease is directly attributable to the misconduct of the original prosecutor. He knowingly presented false testimony and misleading argument to the court in an effort to convince the court that a jailhouse informant was not acting on instructions from the State when he gathered information from Johnson. In fact, however, the informant was acting on instructions from the State, and this rendered his testimony inadmissible. The prosecutor knew this. Yet, the prosecutor sought, successfully, to gain the admission of the informant’s testimony through legal legerdemain, and the informant subsequently testified at trial and revealed his impermissible testimony to the jury.
This is not a case of overzealous advocacy, but rather a case of deliberately misleading the court. If the true facts of the informant’s status had been made known to the trial court, his testimony would have been ruled inadmissible in both the guilt and penalty phases of the trial. This did not happen. The prosecutor’s misconduct obfuscated the truth-seeking function of the court and compromised the integrity of the subsequent proceedings. In light of the State’s failure to show that this error was harmless beyond a reasonable doubt with respect to the penalty phase of the 1988 trial, reversal of the death sentences is the only option available to this Court under the case law of both the United States Supreme Court and this Court.
I. BACKGROUND
The underlying facts of this case are set forth fully in the Court’s opinion on direct appeal following Johnson’s third trial. See Johnson v. State, 608 So.2d 4 (Fla.1992). On the night of January 8-9, 1981, Johnson did the following: he kidnapped, robbed, shot and killed William Evans, a taxicab driver, and set his cab on fire; he robbed, shot and killed Ray Beasley, a man who had given him a ride from a late-night restaurant; he struggled with, shot and killed Theron Burnham, a deputy *55 sheriff who had responded to the scene of the Beasley crime; and he fired upon Clifford Darrington and Samuel Allison, two other deputies who had responded to the scene. The early procedural history of this case is set forth in the Court’s opinion:
In 1981 a jury convicted Johnson of three counts of first-degree murder, two counts of robbery, kidnapping, arson, and two counts of attempted first-degree murder. The trial court sentenced him to death, among other things, and this Court affirmed the convictions and sentences. Johnson v. State, 438 So.2d 774 (Fla.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984). After the signing of a death warrant, Johnson petitioned this Court for writ of habeas corpus, claiming ineffective assistance of appellate counsel for not challenging the trial court’s allowing his jury to separate after it began deliberating his guilt or innocence. We acknowledged that not keeping a capital-case jury together during deliberations is reversible error and granted Johnson a new trial. Johnson v. Wainwright, 498 So.2d 938 (Fla.1986), cert. denied, 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 500 (1987). Johnson’s retrial began in Polk County in October 1987. During the trial, however, the judge granted Johnson’s motion for mistrial based on juror misconduct. After that, the judge granted Johnson’s motions to disqualify him and to change venue of the case. The case then proceeded to trial in Ala-chua County in April 1988 with a retired judge assigned to hear it.
Johnson, 608 So.2d at 6.
At the 1988 trial, Johnson sought to suppress the testimony and notes of James Smith, a jailhouse informant, on grounds that Smith was operating as a government agent and had impermissibly obtained incriminating information from Johnson in 1981 in violation of his Sixth Amendment right to counsel. The motion was summarily denied, and Smith testified at trial. The jury rejected Johnson’s insanity defense and found him guilty of three counts of first-degree murder, two counts of armed robbery, two counts of attempted first-degree murder, and one count each of kidnapping and arson. The judge followed the jury’s recommendation and sentenced Johnson to death on each murder count[2] based on several aggravating circumstances [3] and no statutory or nonstatutory mitigating circumstances. Johnson appealed, and the Court affirmed.[4]
Johnson filed his first rule 3.850 motion in 1994, which the postconviction court dismissed without prejudice. Johnson appealed the dismissal, and while the appeal was pending, he filed an amended motion, which the postconviction court dismissed *56 for lack of jurisdiction. This Court dismissed the pending notice of appeal and directed the postconviction court to reinstate the amended motion and proceed with a hearing. Johnson v. State, 661 So.2d 824 (Fla.1995) (table decision). Johnson then filed a further amended rule 3.850 motion, and the court granted an evidentiary hearing. At the hearing, which was held in 1997, the defense presented James Smith as a witness, and he recanted his prior testimony. He testified that he had earlier been operating on instructions from the State and had lied at trial. The postconviction court found that Smith’s recantation testimony was unbelievable, and denied the motion. Johnson appealed, and the Court affirmed. Johnson v. State, 769 So.2d 990 (Fla.2000). Johnson then filed a habeas corpus petition, raising several claims of ineffective assistance of appellate counsel, which the Court denied. Johnson v. Moore, 837 So.2d 343 (Fla.2002). Johnson filed his first successive postconviction motion in 2003, raising a Ring[5] claim. The postcon-viction court denied relief, and this Court affirmed. Johnson v. State, 933 So.2d 1153 (Fla.2006) (table decision).
In the present proceeding, Johnson filed his second successive postconviction motion in April 2007, raising three claims: (1) a newly discovered evidence, and a Giglio,[6] and a Brady[7] claim; (2) a lethal injection claim; and (3) an ABA Report[8] claim. The postconviction court granted an evi-dentiary hearing on the first claim, and the hearing was held on December 4, 2007. The defense asserted that, based on newly discovered notes found in the files of Hardy Pickard, the prosecutor at the first trial, Johnson was entitled to a new trial. The defense claimed that the notes show that Pickard committed Giglio and Brady violations with respect to State witnesses James Smith and Amy Reid.[9] Following the hearing, the postconviction court denied the rule 3.851 motion and Johnson filed the present appeal, asserting that the court erred in denying each of the claims.
While the present appeal was pending in this Court, the Governor on October 7, 2009, signed a second death warrant for Johnson, with the execution set for November 4, 2009. The Court on October 8, 2009, issued an order allowing the circuit court to consider a successive rule 3.851 motion, should one be filed within the time limits set forth in the order. Johnson on October 27, 2009, filed in circuit court his third successive postconviction motion, but he filed the motion outside the time limits set forth in the order. This Court on October 28, 2009, heard oral argument in the present appeal and granted Johnson’s “Application for Stay of Execution” so the Court could consider his claims related to the issue of prosecutorial misconduct. The stay was to remain in effect pending further order of this Court. The Court on November 5, 2009, issued an order granting the State’s “Motion to Extend Order Granting Jurisdiction to Circuit Court” to allow the circuit court to consider John *57 son’s third successive postconviction motion while this Court was addressing the present appeal.
II. THE 1981 SUPPRESSION HEARING
In 1980, inmate James Smith worked as an informant and potential witness in several cases for Investigator Ben Wilkerson of the Polk County Sheriffs Office. After Johnson was arrested in January 1981, Smith encountered Johnson in the visitation area of the Polk County jail. At the suppression hearing prior to the first trial,[10] Smith testified as follows concerning this initial encounter:
Q. On that occasion did you have a conversation with Paul Johnson?
A. Yes, I did.
Q. Before talking about any of the charges against Mr. Johnson, did you have other types of conversations?
A. Yeah, I asked him what he was down there for and he told me they were coming to get a hair sample. He didn’t specify what kind of hair sample. He told me he wasn’t going to let them have it until they got a court order.
Q. Is that when you began talking about your case?
A. Yes.
Q. Did you ask him about what he was charged with?
A. Yes.
Q. At the time that you talked to Mr. Johnson had anybody asked you to speak to Mr. Johnson about his case?
A. No.
After speaking with Johnson, Smith sought to meet with Investigator Wilkerson to discuss the encounter, and he met with him on February 5,1981, several days after the encounter. At the suppression hearing, Smith testified as follows with respect to that meeting:
Q. Did you discuss with Mr. Wilkerson the possibility of — let me rephrase that. Did you discuss with Mr. — Investigator Wilkerson that you might talk to Mr. Johnson in the future?
A. Yes.
Q. And what did Investigator Wilkerson say to you about talking to Mr. Johnson in the future?
A. Nothing.
Q. Did he ever ask you to record or make any notes about any conversations you had with Mr. Johnson?
A. No.
Q. How about at a later time, did he ever ask you to make any notes?
A. No.
A. You did begin to take notes; is that correct?
A. Yes.
Q. Whose idea was that?

A. Mine.

Q. Did anybody ever suggest that to you?
A. No.
(Emphasis added.)
Investigator Wilkerson testified as follows at the suppression hearing with re *58 spect to that meeting, on direct examination by defense counsel:
Q. After he told you what he told you about those conversations, did you ever suggest to him that he keep any notes or memos of what was told to him?
A. I believe I did. And he brought up the fact that he would not be able to remember half of the things that he had told him about that day. And I said, “Well, it would be in your best interest to write them down.”
Q. Did you talk about if he heard further things from Mr. Johnson that it would be better off for him to write them down?
A. Specifically on that particular meeting, it was strictly the information he gave me at that time.
Q. Did you ever suggest to him that he — did ever at any time you suggest to him that he keep notes of conversations that he had with Mr. Johnson at future times?
A. I don’t recall.
Q. Is it possible?
A. Having previously suggested that he write down what he reported to him, yes, I would have to say it’s possible.
On cross-examination by prosecutor Pick-ard, Wilkerson backtracked, clarifying his prior testimony as follows:
Q. Did you ever — after you found out that James Smith had been talking with Paul Johnson or Mr. Johnson had been giving him information, did you give Smith any instructions on what to do in the future as far as going back and talking to Johnson again and getting more information or anything along those lines?
A. No, sir, I did not.
Q. Did you tell him — give him any instructions at all?

A. No, sir.

(Emphasis added.)
A few days after this meeting with Wilkerson, Smith was transferred from his cell on the third floor of the Polk County jail to a cell directly adjoining Johnson’s cell in a secluded area of the second floor. At the suppression hearing, Smith testified as follows concerning his encounters with Johnson after the transfer:
Q. And you’ve told investigators, haven’t you, that while you were next door to — in the next cell to Mr. Johnson you had some conversations with him about his case; is that right?
A. Correct.
Q. Did you ask him about his charges and how his case was going?
A. Yeah, and he would just come out and tell me.
Q. Sometimes he would?
A. Well, you know, we would be talking about all the while we were back there.
Q. Sometimes you’d ask him about his case and sometimes he’d volunteer things; is that right?
A. Yeah.
Q. Did you make any notes of this?
A. Yes.
[[Image here]]
Q. And what type of notes were those?
A. Just, you know, what had been said during the conversations.
Q. Why did you take those notes?
A. I just took them.
Q. Excúseme?
A. I just took the notes.
Q. For what reason?
A. Because I was going to give them to the State Attorney.
*59 Q. Did you have any motive for giving them to the State attorney, any plans?
A. Yeah, because I didn’t think it was right what he had done.
[[Image here]]
Q. Do you recall the first time you gave notes to Ben Wilkerson?
A. Yeah.
[[Image here]]
Q. Did he say anything about these [notes] are good or anything like that?
A. I think he said it would help me remember. I don’t remember exactly what was said.
Q. Did he ever say these looked good?
A. I can’t remember, it’s been a while back.
Q. And Mr. Wilkerson told you that if it helped you to remember better to go ahead and write them down; is that right?
A. I think that was the conversation.
(Emphasis added.)
Prosecutor Pickard argued as follows in closing argument to the court at the suppression hearing:
Mr. Smith did not even go to the police until after statements had already been made to him. The police indicated that once they were aware that statements had been made to Mr. Smith they made no request of him, did not tell him to go back and get more information, simply took down his information and sent him back into the jail. Mr. Smith later got other information and reported it to the police. That’s his doings. And that’s Mr. Johnson’s doings if he wants to trust Smith. But the bottom line is, as I said, it was not done at the request of any police officer or police agency. And under those circumstances, there is no governmental involvement in it.
[[Image here]]

The issue is whether the police had anything to do with what Smith was doing. And they did not according to all the testimony from all the police officers and Mr. Smith, Smith did it on his own.

(Emphasis added.)
The trial court denied the motion to suppress, reasoning that although it was a close question as to whether Smith was operating as a government agent, it appeared that the police were passive recipients of information that was being passed to them from Johnson through Smith:
[T]he officers have all testified that none of them directed or told or in any fashion tried to get Mr. Smith to elicit these statements from Mr. Johnson especially the first statements. And it gets to be a closer question on the ones where he was making notes. But apparently they were merely, as Mr. Smith has said, passively receiving those things. Finally, Mr. Smith himself testified that he was doing it all on his own. In light of all the testimony that I’ve heard ... I believe this Court has no choice but to find that the officers did not directly or surreptitiously or in any fashion direct Mr. Smith to do what he did. In light of that, I am going to deny your motion as to Mr. Smith’s statements or whatever notes he may have in the particular matter.
(Emphasis added.)
This Court on direct appeal agreed that it was a close question as to whether Smith was operating as a government agent, but the Court concluded that the evidence supported the trial court’s suppression ruling:
Here, the trial court held that the detectives did not direct Smith, either directly or surreptitiously, to talk with Johnson or to take notes on their con *60 versations. [The relevant cases] do not impose on the police an affirmative duty to tell an informer to stop talking and not approach them again nor do they require that informers be segregated from the rest of a jail’s population. We agree with the trial court that this case presents a close question on whether Smith had become an agent of the state, but we find the ruling that he had not to be supported by the evidence.
Johnson v. State, 438 So.2d 774, 776 (Fla. 1983) (emphasis added).
Subsequently, at the 2007 evidentiary hearing, prosecutor Pickard was confronted with his own handwritten notes from the State files that were disclosed to the defense in 1997 and that are now the subject of Johnson’s present postconviction motion. One of the notes, which was dated February 19, 1981, states: “Wilcox— Talk to me + Glen about agent theory.” And another note on the same page is configured as follows:
Ben [Wilkerson] — Smith had already talked to Johnson—
Told Smith to make notes
Told [Smith] to keep ears open
When Pickard was confronted with these notes on direct examination by defense counsel, the following transpired:
Q. Who was Wilcox?
A. Don Wilcox was — I think he was in charge of our intake unit in the State Attorney’s Office at that time. He was working in intake. He was an assistant state attorney in our office is who he was.
Q. And so the indication that — well, again, the note says, “talked to me and Glen about agent theory.” Who’s Glen, do you know?
A. Glen Brock. James Smith’s attorney.
Q. Okay. Do you know why you would have written down you went into this conversation about agent theory?
A. Sure. We were concerned that Mr. Smith not be considered an agent of the State. I was aware that the law was we could not send Mr. Smith in there to take statements from Mr. Johnson because it would have violated his attorney — he had an attorney. And I wanted to make sure that everybody was on the same page that Mr. Smith was not planted, so to speak, in Mr. Johnson’s cell for the purpose of obtaining statements.
Q. Okay. And do you recall whether there was an issue as to whether or not he was told to take notes or anything like that?
A. I’m sure he was told to listen, to take notes if he had an opportunity to take notes as to anything that Mr. Johnson said. He may have been even told to turn over the notes.
[[Image here]]
Q. Well — well, given on what you just said, let me just call your attention to the lines next to — to the name Ben [Wilkerson], Because there is a line that says “Told Smith to make notes,” and a line that says, “Told Smith to keep his ears open.” Is that your understanding of what Mr. Smith would have been told?

A. Yes.

Q. To take notes and to keep his ears open?
A. Correct.
Q. And your understanding is that doesn’t turn him into an agent?
A. Correct.
(Emphasis added.)
This testimony by Pickard at the 2007 evidentiary hearing is contrary to all the above emphasized passages in the testimo *61 ny of Smith and Wilkerson and in the closing argument of Pickard at the 1981 suppression hearing. In those emphasized passages, the declarants indicate that Smith, after his initial meeting with Investigator Wilkerson, was acting on his own in gathering information from Johnson and recording it in notes and then disclosing it to the State, whereas in prosecutor Pick-ard’s testimony at the evidentiary hearing, Pickard indicates that Smith was told to go back and gather information (he was told “to keep his ears open”) and record it in notes (he was told “[t]o take notes”) and then presumably disclose it to the State (he “may have been even told to turn over the notes”).
III. GOVERNMENT AGENT
The United State Supreme Court addressed the issue of jailhouse informants in United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). The facts there were as follows:
On November 21, 1972, shortly after Henry was incarcerated, Government agents working on the Janaf robbery contacted one Nichols, an inmate at the Norfolk city jail, who for some time prior to this meeting had been engaged to provide confidential information to the Federal Bureau of Investigation as a paid informant. Nichols was then serving a sentence on local forgery charges. The record does not disclose whether the agent contacted Nichols specifically to acquire information about Henry or the Janaf robbery.
Nichols informed the agent that he was housed in the same cellbloek with several federal prisoners awaiting trial, including Henry. The agent told him to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery. In early December, after Nichols had been released from jail, the agent again contacted Nichols, who reported that he and Henry had engaged in conversation and that Henry had told him about the robbery of the Janaf bank. Nichols was paid for furnishing the information.
[[Image here]]
Nichols testified at trial that he had “an opportunity to have some conversations with Mr. Henry while he was in the jail,” and that Henry told him that on several occasions he had gone to the Janaf Branch to see which employees opened the vault. Nichols also testified that Henry described to him the details of the robbery and stated that the only evidence connecting him to the robbery was the rental receipt. The jury was not informed that Nichols was a paid Government informant.
Henry, 447 U.S. at 266-67, 100 S.Ct. 2183 (footnotes omitted).
Henry was convicted in federal district court, but the circuit court reversed and remanded for an evidentiary hearing into whether Nichols was acting as a government agent. At the hearing, a federal agent submitted an affidavit describing his relationship with Nichols:
I recall telling Nichols at this time to be alert to any statements made by these individuals [the federal prisoners] regarding the charges against them. I specifically recall telling Nichols that he was not to question Henry or these individuals about the charges against them, however, if they engaged him in conversation or talked in front of him, he was requested to pay attention to their statements. I recall telling Nichols not to initiate any conversations with Henry regarding the bank robbery charges against Henry, but that if Henry initiated the conversations with Nichols, I *62 requested Nichols to pay attention to the information furnished by Henry.
Henry, 447 U.S. at 268, 100 S.Ct. 2188 (quoting agent’s affidavit). The federal agent’s affidavit also stated that the agent “never requested anyone affiliated with the Norfolk city jail to place Nichols in the same cell with Henry.” Id. The district court again denied relief, and the circuit court again reversed, concluding that the government had violated Henry’s Sixth Amendment right to counsel. The government sought review.
The United States Supreme Court framed the Sixth Amendment right to counsel issue as follows:
This Court first applied the Sixth Amendment to postindictment communications between the accused and agents of the Government in Massiah v. United States, [377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) ]. There, after the accused had been charged, he made incriminating statements to his codefen-dant, who was acting as an agent of the Government. In reversing the conviction, the Court held that the accused was denied “the basic protections of [the Sixth Amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him.” The Massiah holding rests squarely on interference with his right to counsel.
The question here is whether under the facts of this case a Government agent “deliberately elicited” incriminating statements from Henry within the meaning of Massiah. Three factors are important. First, Nichols was acting under instructions as a paid informant for the Government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols.
Henry, 447 U.S. at 270, 100 S.Ct. 2183 (citation omitted). The Court then affirmed based on the following reasoning:
By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry’s Sixth Amendment right to counsel. This is not a case where, in Justice Cardozo’s words, “the constable ... blundered,” People v. DeFore, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926); rather, it is one where the “constable” planned an impermissible interference with the right to the assistance of counsel.
Henry, 447 U.S. at 274-75, 100 S.Ct. 2183 (footnote omitted) (emphasis added).
In the present case, based on the evidence now before the Court as a result of the 2007 evidentiary hearing, we conclude that the State intentionally created a situation likely to induce Johnson to make incriminating statements without the assistance of counsel.[11] First, James Smith was an experienced informant who had been working with Investigator Wilkerson for at least a month on pending cases prior to encountering Johnson in the visitation area of the jail. Second, according to prosecutor Pickard’s notes and testimony at the 2007 evidentiary hearing, during Smith’s initial meeting with Wilkerson, Smith was told to go back and “keep his ears open” and “take notes” and then presumably disclose the notes to the State. Third, a few days after Smith’s initial meeting with Wilkerson, Smith was transferred from his cell on the third floor of the Polk County jail to a semi-isolation cell *63 directly adjoining Johnson’s semi-isolation cell in a secluded area on the second floor, where the two could talk freely and privately.[12]
And finally, Smith was not operating as a passive listener with respect to Johnson, but rather was actively engaging Johnson in conversation and questioning him concerning his case and then reporting back to Investigator Wilkerson on a regular basis[13] — and prosecutor Pickard was aware of this at the time of the suppression hearing. For example, Smith testified as follows at his July 20, 1981, pretrial deposition, which was attended by Pickard, on direct examination by defense counsel:
Q. OK. You trying to — were you trying to ask him questions to find out what was going on?
A. Well, sometimes I asked him a question, you know. And sometimes then he just, you know, come right out and want to talk, and so I’d talk to him, you know. I didn’t necessarily like always ask him, you know, down wanting to — I wasn’t always talking about this. I was—
Q. I guess that would make him suspicious.
A. I don’t know. A lot of times he’d be — just start talking, you know. Especially when he felt really bad, I mean after he talked to [his wife] Cheryl and little Paul or something. That’s when he started talking, you know. Talked a lot about escaping and this and that.
Q. You figured that you hadn’t been planted down there because of what Ben [Wilkerson] said that they couldn’t do that; is that right?
A. Right.
Q. OK. Did you figure that as long as you were there you’d find out what you could?
A. Yeah ....
Q. So you figured you’d find out what you could while you were there?
A. (Nods head.)
Q. Is that a yes?
A. Yes.
[[Image here]]
Q. Did he say what happened when deputy Burnham arrived?
*64 A. Yeah. I asked him,, you know, why he killed him. He said just — -let’s put it he got killed in the line of duty.
[[Image here]]
Q. Did you ever talk about the cab driver again?
A. Yeah. We talked about it, you know. And I told him the [dispatcher] might be able to identify his voice because he had told me that he remembered talking on the radio a little bit. But he didn’t remember what he said. And I said, “Well ain’t you ivorried about the [dispatcher] identifying your voice? ” And he goes, “No.” Because he said, “When you’re all fd up” — you know, I ain’t going to say the word. Said, “When you’re all fd up,” he said, “You know yourself you talk different and stuff.”
(Emphasis added.)
Further, as noted above, Smith testified as follows at the August 28, 1981, suppression hearing, which was also attended by Pickard, on direct examination by defense counsel:
Q. And you’ve told investigators, haven’t you, that while you were next door to — in the next cell to Mr. Johnson you had some conversations with him about his case; is that right?
A. Correct.
Q. Did you ask him about his charges and, how his case was going?
A. Yeah, and he would just come out and tell me.
Q. SomMimes he would?
A. Well, you know, we would be talking about all the while we were back there.
Q. Sometimes you’d, ask him, about his case and sometimes he’d, volunteer things; is that right?

A. Yeah.

(Emphasis added.)
Smith testified at the suppression hearing that while he was housed next to Johnson, he met with Investigator Wilkerson at least three or four times and turned in his notes. Wilkerson also testified that he met with Smith at least three or four times during this period and that Smith turned in his notes. And prosecutor Pickard’s notes indicate that he too met with Smith on at least two occasions — February 16 and 19, 1981 — during this period and that they discussed Johnson’s case in detail. As it turned out, shortly after Smith testified at Johnson’s trial, Smith’s seven-year prison sentence was vacated and he was set free. Based on the foregoing, we conclude that Smith, after his initial meeting with Investigator Wilkerson, was acting as a government agent, and his testimony and notes concerning Johnson’s statements should have been suppressed.
IY. KNOWING USE OF FALSE TESTIMONY
The United States Supreme Court in Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), held that a prosecutor cannot knowingly use false testimony against a defendant. To establish a Giglio violation, a defendant must show the following: (1) the prosecutor presented false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006). Once the first two prongs are established, the State bears the burden of showing that the false evidence was immaterial by showing that its use was harmless beyond a reasonable doubt. Id. To do this, the State must show that “there is no reasonable possibility that the error contributed to the conviction,” Id. (quoting State v. DiGuilio, 491 So.2d 1129, *65 1138 (Fla.1986)). A court’s decision with respect to a Giglio claim is a mixed question of law and fact, and a reviewing court will defer to the lower court’s factual findings if they are supported by competent, substantial evidence, but will review the court’s application of law to facts de novo. Sochor v. State, 883 So.2d 766, 785 (Fla. 2004).
The postconviction court below ruled as follows concerning Johnson’s Giglio claim:
The defense alleges that the information in Mr. Pickard’s notes contradicts testimony given by Mr. Wilkerson that he did not give Mr. Smith any instructions on what to do in the future as far as talking to Mr. Johnson again and getting more information. The Court does not find that the information in the notes or Mr. Pickard’s testimony regarding the notes shows that Mr. Smith was an agent for law enforcement in obtaining information from Mr. Johnson. The trial court in the first Motion To Vacate spent considerable time addressing this issue and deciding that Mr. Smith’s recantation of his trial testimony was not credible. The information contained in the state attorney notes does not clearly show that Judge Bentley’s conclusion was in error. At a hearing on a Motion to Suppress held on August 28, 1981, Mr. Wilkerson testified that Mr. Smith first contacted him, and he told Mr. Smith it was in his best interest to write down what Mr. Johnson told him. Mr. Wilkerson agreed in his testimony that it was possible that he had told Mr. Smith to write down future conversations.
[[Image here]]
... With regard to the Defendant’s claim of Giglio violations, the Defendant has not supported a claim that false testimony of a material nature was presented in court, or that the State allowed false testimony of a material nature to be presented in court. The in-foi’mation from the notes and testimony at the evidentiary hearing regarding the meaning of the notes does not support a conclusion that the testimony given by James Smith ... or any other witness was false or that the prosecutor knew false testimony was being presented to the court. The Court does not find that the defense has supported allegations that there were ... Giglio violations....
Notably, this ruling was not based on any discrete factual findings to which this Court must defer. Because the ruling consists of the court’s application of law to facts, it is subject to de novo review.
On this record, we conclude that prosecutor Pickard committed a Giglio violation with respect to Smith at the 1981 suppression hearing. First, the prosecutor presented false testimony and misleading argument to the court. As noted above, all the earlier referenced passages in the testimony of Smith and Wilkerson and in Pickard’s closing argument at the 1981 suppression hearing are contrary to Pick-ard’s notes and his testimony at the 2007 evidentiary hearing. In those referenced passages, the declarants indicate that Smith, after his initial meeting with Investigator Wilkerson, was acting on his own in gathering information from Johnson and recording it in notes and then disclosing it to the State, whereas in Pickard’s notes and testimony at the evidentiary hearing, Pickard indicates that Smith was told to go back and gather information (he was told to “keep his ears open”) and record it in notes (he was told “[t]o take notes”) and then presumably disclose it to the State (he “may have been even told to turn over the notes”).
Second, according to Pickard’s notes and testimony, he knew at the time of the *66 suppression hearing that the testimony of Smith and Wilkerson was false and his own closing argument was misleading. Again as noted above, when Pickard was shown his handwritten notes at the 2007 evidentiary hearing, he testified as follows with respect to the meaning of those notes:
Q. Okay. And do you recall whether there was an issue as to whether or not [Smith] was told to take notes or anything like that?
A. I’m sure he was told to listen, to take notes if he had an opportunity to take notes as to anything that Mr. Johnson said. He may have been even told to turn over the notes.
[[Image here]]
Q. Well — well, given on what you just said, let me just call your attention to the lines next to — to the name Ben [Wilkerson]. Because there is a line that says “Told Smith to make notes,” and a line that says, “Told Smith to keep his ears open.” Is that your understanding of what Mr. Smith would have been told?
A. Yes.
Q. To take notes and to keep his ears open?
A. Correct.
(Emphasis added.)
Significantly, there was no equivocation in Pickard’s response with respect to Smith’s listening and taking notes: “I’m sure he was told to listen, to take notes.” (Emphasis added.) Given this response and given the plain language of Pickard’s notes (“Ben [Wilkerson] — Smith had already talked to Johnson — Told Smith to make notes. Told [Smith] to keep ears open.”), we conclude that Pickard knew in 1981 that during Smith’s initial meeting with Investigator Wilkerson, Smith was told to go back and “keep his ears open” and “take notes” and then presumably disclose the notes to the State. This conclusion is bolstered by the fact that Pickard’s notes indicate that he met with Smith on February 16 and 19, 1981, and discussed Johnson’s case with him in detail. Accordingly, we conclude that Pickard knew at the time of the suppression hearing that the testimony of Smith and Wilkerson was false and his own closing argument to the court was misleading.
As a related matter, we conclude that Pickard also knew at the time of the suppression hearing that Smith’s testimony concerning Johnson’s statements was inadmissible. The decision in Henry had been issued the year before, and Pickard had made a point of discussing the issue with other attorneys on his staff and with Smith’s attorney. Pickard’s notes and his testimony at the 2007 evidentiary hearing and Smith’s testimony at his 1981 deposition, which was attended by Pickard, show that Pickard knew the following: Smith was an experienced informant who had worked with Investigator Wilkerson on other cases; after Johnson had been arrested and placed in the Polk County jail, Smith had encountered him in the visitation area of the jail; after Smith’s initial encounter with Johnson, Smith had met with Wilkerson and had been told to go back and “keep his ears open” and “take notes” and presumably disclose the notes to the State; Smith had subsequently been transferred to a cell next to Johnson’s cell in a secluded area of the jail, where the two could talk freely and privately; and Smith thereafter did not act as a passive listener but rather actively engaged Johnson in conversation and questioned him concerning his case and then reported back to Wilkerson on a regular basis. Thus, unlike the incomplete scenario that Pickard presented to the suppression court in 1981 and that this Court reviewed on appeal in 1983, the above scenario is not a “close question” at all — Smith clearly was *67 acting as a government agent and his testimony and notes concerning Johnson’s statements were inadmissible under Henry.
And third, the State has failed to show that Pickard’s knowing use of false testimony and misleading argument at the 1981 suppression hearing was immaterial, i.e., that it was harmless beyond a reasonable doubt. Specifically, the State has failed to show that “there is no reasonable possibility that the error contributed to the [death sentences].” Had Smith and Wilkerson testified truthfully and had Pickard argued truthfully in closing argument at the 1981 suppression hearing, the trial court would have been bound under Henry to suppress Smith’s testimony and notes. As it turned out, however, due to the false testimony of the State witnesses and the misleading argument of Pickard, the motion to suppress was denied and Smith’s impermissible testimony and notes were admitted and later used by the State at the 1988 trial. As explained below, we conclude that while the State has shown that this error was immaterial with respect to Johnson’s convictions, the State has failed to show that the error was immaterial with respect to his death sentences.
V. MATERIALITY
A. Smith’s Testimony at the 1988 Trial
During the State’s case-in-chief in the guilt phase of the 1988 trial, Smith testified as to what Johnson told him in February and March 1981 concerning each of the murders. First, Smith testified as follows concerning Johnson’s statements with respect to the murder of William Evans, the taxicab driver:
Q. During the time period of February and March of 1981, did you and Mr. Johnson have any conversations about the events that had led to him being in jail?
A. Several conversations.
Q. In particular, during that time period, February and March of 1981, did Mr. Johnson make any statements that you recall about the death of a cab driver?
A. Yes, sir, he did.
Q. What do you remember him telling you about that?
A. That he had killed a cab driver and burnt the car, because his fingerprints was in it.
Q. Do you remember if he said anything else about that particular incident?
A. That he had talked to the lady dispatcher on the radio, but-I asked him was he worried about her identifying his voice, and he said no, because your voice is different when you’re drunk than when you’re sober.
Second, Smith testified as follows concerning Johnson’s statements with respect to the murder of Ray Beasley, the driver who gave Johnson a ride from the late-night restaurant:
Q. Do you remember him making any statements to you or talking to you about the killing of a man named Beasley?
A. Yes, sir.
Q. What, if anything, did he tell you about that?
A. He said he got a ride with Mr. Beasley, told him he had to urinate, asked him would he pull over. When he pulled over, he went out and told him, after he urinated, that he had lost his billfold and would he mind helping him find it, and when he come back there, he shot him.
Q. Did Mr. Johnson tell you if he got any money from Mr. Beasley after he shot him?
*68 A. I think it was around a $100. It’s been a while. I can’t remember real good.
Q. Now, did Mr. Johnson make any statements to you describing the position Mr. Beasley was in at the time that he shot him?
A. I believe it was down on his knees.
And third, Smith testified as follows concerning Johnson’s statements with respect to the murder of Theron Burnham, the police officer:
Q. Did you ever talk with Mr. Johnson about the killing of a sheriffs deputy?
A. Yes, sir, I did.
Q. What do you remember him telling you about that?
A. That it was a struggle. The deputy pulled up and there was a struggle between him and the deputy, and the deputy was shot twice.
[[Image here]]
Q. Do you remember if he told you anything else....
A. Well, I remember the first deputy, I think Mr. Burnham, he said [his death] was all in the line of duty.
Further, Smith testified in 1988 as follows concerning Johnson’s plan to evade punishment for the killings by tricking everyone and acting as though he were crazy at the time of the crimes:
Q. Mr. Smith, do you recall if Mr. Johnson, during the time you were talking to him in February of 1981, made a specific statement to you ... about ivhat kind of defense he might have and what might happen to him? Do you remember if he made such a statement, first' of all?
A. Yes, sir, I think I remember it.
Q. Do you remember it verbatim?
A. I believe so.
Q. What do you recall him telling you in that respect?
A. He said he could play like he was crazy [when he was doing all this], and they would send him to the crazy house for a few years and that would be it.
(Emphasis added.)[14]
B. Impact on the 1988 Trial
Based on this record, we conclude that the State’s use of Smith’s testimony was immaterial in the guilt phase of the 1988 trial, but was material in the penalty phase. With respect to the guilt phase, the State has met its burden of showing that Smith’s testimony — including both his description of the details of the crimes and his “play like he was crazy” statement — was harmless beyond a reasonable doubt. First, the defense conceded that Johnson had committed the killings but claimed that he was insane at the time because of his drug use. Because Johnson conceded that he had committed the killings, the State’s use of Smith’s testimo *69 ny concerning the details of the crimes was immaterial as to Johnson’s guilt. And second, because of the circumstances of these killings, the State’s use of Smith’s “play like he was crazy” statement was also immaterial as to Johnson’s guilt. Under the insanity standard, Johnson was required to show either that he did not know what he was doing or the consequences, or that he did not know that what he was doing or the consequences were wrong.[15] Yet the circumstances of the killings display a degree of awareness on the part of Johnson that belies his claim of not knowing what he was doing or not knowing that what he was doing was wrong. The insanity standard thus posed a virtually insurmountable hurdle for the defense, regardless of Smith’s “play like he was crazy” statement.
With respect to the penalty phase, on the other hand, we conclude that the State has not met its burden of showing that Smith’s testimony was harmless beyond a reasonable doubt. The penalty phase jury was the same jury that had sat through the guilt phase proceeding and had heard Smith’s testimony concerning Johnson’s role in committing the crimes and his plan to “play like he was crazy.” The jury had also heard the prosecutor’s final closing argument in the guilt phase wherein he emphasized Smith’s “play like he was crazy” statement, twice:
THE COURT: All right. Thank you, counselor. The State may at this time make its final closing.
MR. ATKINSON: Thank you, Your Honor. If it please the Court. Counsel. Good afternoon, ladies and gentlemen.
He could play like he was crazy [when he was doing all this], and they would send him to the crazy house for a few years, and that would be it. February 1981, the words of Paul Johnson.
[[Image here]]
There is no dispute in the evidence that Mr. Smith, in fact, was in jail with Mr. Johnson during February and March of 1981. It is an undisputed fact that Mr. Johnson trusted Mr. Smith, and gave him not only the facts of his case in the police report, so that Mr. Smith could read them to him, but talked to him about the events. And it’s an undisputed fact that throughout that time period, February and March of 1981, Mr. Smith made note of what was said.
Now, counsel suggests to you that you should not believe Mr. Smith because he has a motive to lie.
[[Image here]]
Well, Mr. Smith does, from time to time become a snitch, and apparently each time he goes to the police and provides them facts, they find those fact of sufficient interest and dependability that they act on those facts, and they *70 reward him for what he has done, and they’re willing to believe him the next time he comes forward. It would be kind of hard for a jailhouse snitch to do much to help himself if every time he went to the police when he needed help, and provided them with information about crimes or criminals, he got it wrong, he made mistakes, the information wasn’t any good.
But more importantly, ladies and gentlemen, as with every witness, including Mr. Smith, you look at what they had to tell you, and you come to a conclusion as to its truth.
Paul Johnson did not see [defense expert] Dr. Afield until August of 1981. There would be nothing in the police reports [of Johnson’s crimes, which Smith read to Johnson], I suggest to you, that could ever tell Mr. Smith in February of 1981 that this statement would be important to anybody. But it was one of those that Mr. Johnson made, and Mr. Smith remembers it still: He could play like he was crazy [when he was doing all this], and they would send him to the crazy house for few years, and that would be it.
(Emphasis added.) Further, the penalty phase jury was specifically instructed that it should base its advisory sentence not just on the evidence that was presented in the penalty phase but also on the evidence that was presented in the guilt phase, which included Smith’s testimony and notes. In his opening statement to the penalty phase jury, the prosecutor stated that the State planned to rely entirely on the testimony and exhibits that it had already presented in the guilt phase, which again included Smith’s testimony and notes. The defense, on the other hand, presented the testimony of Johnson’s aunt and two uncles and three of the mental health experts who had testified in the guilt phase.
After closing arguments, the judge instructed the jury with respect to the following mental health mitigating circumstances, both statutory and nonstatutory:
Among the mitigating circumstances you may consider, if established by the evidence, are as follows:
One, the crimes for which the defendant is to be sentenced were committed while he was under the influence of extreme mental or emotional disturbance.
Two, the capacity of the defendant to appreciate the criminality,of his conduct was substantially impaired.
Three, the capacity of the defendant to conform his conduct to the requirements of law was substantially impaired.
Four, at the time that the crimes were committed, the defendant was under the influence of drugs.
Five, at the time of the crimes, the defendant suffered a disorder of drug dependency which contributed to his committing the crimes.
The judge gave the following instruction concerning the burden of proof for mitigating circumstances: “A mitigating circumstance need not be proved beyond a reasonable doubt by the defendant. If you are reasonably convinced that a mitigating circumstance exists, you may consider it established.” The jury then deliberated and returned death recommendations for each of the murders, but the recommendations were nonunanimous on each count: a vote of eight to four for the murder of Evans, a vote of nine to three for the murder of Beasley, and a vote of nine to three for the murder of Burnham. The judge sentenced Johnson to death on all three counts based on several aggravating *71 circumstances[16] and no statutory or non-statutory mitigating circumstances.
Although Smith’s testimony appears to be damaging to the defense in general, it appears to be far more consequential with respect to the death sentences than the convictions. Unlike the situation in the guilt phase, where the rigorous nature of the insanity standard and the circumstances of the killings posed a virtually insurmountable hurdle for the defense, the situation in the penalty phase presented a far different scenario — a scenario where Smith’s impermissible testimony and notes reasonably may have moved the tipping point. First, the proposed mental health mitigating circumstances posed a lower hurdle for the defense to overcome than the insanity standard, for the defense needed to show only that at the time of the killings Johnson was under the influence of extreme mental or emotion disturbance, or his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, or he was under the influence of drugs, or he suffered from a disorder of drug dependency that contributed to his committing the crimes. This was an entirely different scenario from the guilt phase, where the defense had to show that Johnson was insane.
Second, the burden of proof for mitigating circumstances is a more forgiving burden for the defense than the burden of proof for insanity, for jurors must only be “reasonably convinced” that a mitigating circumstance exists in order to consider it established, regardless of the State’s showing. Third, unlike the situation with respect to the insanity defense, the facts of these killings are not necessarily inconsistent with the proposed mental health mitigating circumstances, for Johnson conceivably could have proceeded with the killings in a deliberate manner and yet still have been under the influence of extreme mental or emotional disturbance, or operating with a substantially impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, or operating under the influence of drugs, or suffering from a drug dependency that contributed to his commission of the crimes. In fact, all the mental health experts that testified in the penalty phase attested to this. And finally, the proposed mental health mitigation was extensive, consistent and unrebutted. Unlike the situation in the guilt phase, where the State presented its own mental health experts in rebuttal, the testimony of Johnson’s mental health experts in the penalty phase was unrebutted.
Dr. Gary Ainsworth, a psychiatrist, testified that at the time of the crimes Johnson was severely intoxicated on amphetamines, that he was under extreme mental or emotional disturbance, that his capacity to appreciate the criminality of his conduct was somewhat impaired, and that his capacity to conform his conduct to the requirements of law was substantially impaired. Dr. Thomas McClane, a psychiatrist, testified that at the time of the crimes Johnson was substantially intoxicated on amphetamines, that he suffered from amphetamine-induced delirium, that he was under extreme mental and emotional disturbance, that his capacity to appreciate the criminality of his conduct was substantially impaired, and that his capacity to conform his conduct to the requirements of law was substantially impaired. And Dr. Walter Afield, a psychiatrist, testified that at the time of the crimes Johnson was very heavily intoxicated on amphetamines, that he exhibited symptoms of amphetamine-induced delirium, that he *72 was under the influence of extreme mental or emotional disturbance, that his ability to appreciate the criminality of his conduct was substantially impaired, and that his ability to conform his conduct to the requirements of law was substantially impaired.
Based on the foregoing, we conclude that Smith’s testimony was material in the penalty phase in two respects. First, Smith’s statements concerning the details of the killings may have reinforced in jurors’ minds the deliberate nature of the killings and thereby caused jurors to discount the proposed mental health mitigation. Specifically, Smith provided details of the killings that emphasized their coldblooded nature and that were not provided by any other State witnesses. Smith alone testified that Johnson said the following: that he set the cab on fire to destroy his fingerprints; that he lured Beasley to the back of the car by telling him that he had lost his billfold; that he forced Beasley to his knees before shooting him in the head; and that the death of the deputy was “all in the line of duty.” And second, Smith’s “play like he was crazy” statement may have contributed to a conclusion, in the eyes of jurors, that the proposed mental health mitigation was inapplicable to Johnson, for this statement makes it appear as though Johnson had decided beforehand to trick his own mental health experts and feign mental health issues in order to evade punishment for the killings. Again, jurors may have discounted the proposed mental health mitigation, which was extensive, consistent and otherwise unrebutted, because of this statement.
We note that despite the damaging testimony of Smith, the jury at Johnson’s 1981 trial recommended death by the slimmest of margins — a seven-to-five vote.[17] The jury at Johnson’s 1988 trial also recommended death by a non-unanimous vote on each count: eight to four, nine to three, and nine to three. Had Smith’s testimony been suppressed in 1981, the outcome of either trial might have been different. In sum, based on this record, we conclude that the State’s use of Smith’s testimony was immaterial in the guilt phase of the 1988 trial but was material in the penalty phase, for the State has failed to show that “there is no reasonable possibility that the error contributed to the [death sentences].” Guzman, 941 So.2d at 1050. We also conclude that the State’s due diligence argument is without merit.[18]
*73 VI. CONCLUSION
We conclude that newly disclosed evidence shows the following. First, after Johnson was arrested and counsel was appointed, the State intentionally created a situation likely to induce Johnson to make incriminating statements to a jailhouse informant, James Smith, in violation of Johnson’s Sixth Amendment right to counsel. Because Johnson’s statements were imper-missibly elicited, Smith’s testimony concerning those statements was inadmissible under United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Second, although the prosecutor at Johnson’s first trial knew that Johnson’s statements were impermissibly elicited and that Smith’s testimony was inadmissible, he knowingly used false testimony and misleading argument to convince the court to admit the testimony. And third, because Smith’s testimony was admitted and later used — innocently but impermissibly — by a different prosecutor at Johnson’s 1988 trial, and because the State has failed to show that this error did not contribute to the jury’s advisory sentences of death, we must vacate the death sentences under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and remand for a new penalty phase proceeding before a new jui-y. This result is dictated by the misconduct of the original prosecutor in this case, Hardy Pickard. His misconduct tainted the State’s case at every stage of the proceedings and irremediably compromised the integrity of the entire 1988 penalty phase proceeding. This is not a case of overzealous advocacy, but rather a case of deliberately misleading both the trial court and this Court.
It must be emphasized that in our American legal system there is no room for such misconduct, no matter how disturbing a crime may be or how unsympathetic a defendant is. The same principles of law apply equally to cases that have stirred passionate public outcry as to those that have not. Cf. Jones v. State, 705 So.2d 1364, 1367 (Fla.1998) (noting that although “the rule of objective, dispassionate law in general [] may sometimes be hard to abide, the alternative — a Court ruled by emotion — is far worse”). In our system of justice, ends do not justify means. Rather, experience teaches that the means become the end and that irregular and untruthful arguments lead to unreliable results. Lawlessness by a defendant never justifies lawless conduct at trial. See, e.g., United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Giglio; Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Guzman v. State, 868 So.2d 498 (Fla.2003). The State must cling to the higher standard even in its dealings with those who do not. Accordingly, we must grant relief.
We find the remainder of Johnson’s claims to be without merit.[19] We *74 reverse the postconviction court’s order denying Johnson’s rule 3.851 motion.[20] We vacate Johnson’s death sentences and remand for a new penalty phase proceeding before a newly empanelled jury.[21] Because the death warrant is now moot, we lift the stay of execution.
It is so ordered.
PARIENTE, LEWIS, and LABARGA, JJ., concur.
POLSTON, J., dissents with an opinion.
QUINCE, C.J., and CANADY, J., recused.

. See, e.g., United States v. Bagley, 473 U.S. 667, 680, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("[T]he knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves ‘a corruption of the truth-seeking function of the trial process.' ”); Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("[T]his Court [has] made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.’ "); Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.' "); Guzman v. State, 868 So.2d 498, 507 (Fla.2003) ("[T]he knowing use of perjured testimony involves prosecutorial misconduct and ‘a corruption of the truth-seeking function of the trial process.' ”).

. The jury recommended a sentence of death by a vote of eight to four for the murder of William Evans, nine to three for the murder of Ray Beasley, and nine to three for the murder of Theron Burnham.

. The judge found that the following aggravating circumstances had been established for the three murders. For the murder of Evans: (1) previous conviction of violent felony; (2) committed while engaged in robbery, kidnapping, and arson; (3) committed for financial gain; and (4) committed in a cold, calculated, and premeditated manner. For the murder of Beasley; (1) previous conviction of violent felony; (2) committed during a robbery; (3) committed for pecuniary gain; and (4) committed in a cold, calculated, and premeditated manner. And for the murder of Burnham: (1) previous conviction of a violent felony; (2) committed while fleeing after committing a robbery; (3) committed to avoid or prevent a lawful arrest; and (4) committed in a cold, calculated, and premeditated manner.

.This Court struck the pecuniary gain aggravating circumstance that the trial court had found for the Beasley murder, but the Court found that the court's error was harmless.

. Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. American Bar Association, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Florida Death Penalty Assessment Report (2006).

.Amy Reid, who was with Ray Beasley when he picked up Johnson at a late-night restaurant and who rode in the car with Beasley and Johnson before Beasley was shot, identified Johnson from a photo-pack display and from a lineup. She testified at trial concerning the events surrounding Beasley’s murder.

. Johnson initially filed a motion to suppress Smith’s testimony and notes at the 1981 trial, and it was denied after a hearing. Johnson then renewed and supplemented the motion at the 1987 trial, and the same judge denied it after a hearing, ruling as follows: "I haven't heard anything to change [my 1981 ruling]. I’m going to deny the motion as I did, even with [this] additional information.” See infra note 12. Johnson then renewed the motion at the 1988 trial, and a different judge summarily denied it, ruling as follows: "The same ruling [that was made earlier in this case] would be made by this Court. I've read that part of this file and am familiar with this witness and what his testimony is anticipated to be.”

. Throughout this pretrial period, Johnson was represented by counsel.

. Smith testified that there were legitimate reasons for the move. The record, however, shows that the Polk County jail was operated by the Polk County Sheriffs Office, which was responsible for investigating this case. Further, this issue was the focus of the 1987 suppression hearing. There, Johnson renewed his 1981 motion to suppress and supplemented it by presenting James Smith and another former inmate, James Still, as witnesses. Both Smith and Still testified as to their respective cell locations vis-a-vis Johnson’s cell in the Polk County jail in 1981. According to their testimony, Still had been residing in a particular semi-isolation cell since September 1980, and then Johnson was placed in a similar cell next to him in January 1981. The two could talk freely through the steel wall, though Johnson never talked about his case. About a month later, Smith was moved into the area and the three inmates, over the course of a day, were transferred to different cells within the block so that Smith, not Still, ended up in the cell next to Johnson. Inmate Still was surprised by the transfer because he had been residing in the same cell for five or six months, and he had been given no reason for the transfer. He testified that he had heard through the “vine” that the transfer was done to accommodate Smith's “snitching.” The defense presented this testimony in an effort to show that Smith was acting as a government agent. The court, however, denied the motion.

. Cf. Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) ("[T]he defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.”).

. This statement was addressed at the 1997 evidentiary hearing, wherein the defense lawyers from the 1988 trial testified that they had made a tactical decision to cross-examine Smith concerning certain statements Johnson had made to him that were helpful to the defense even though this would open the door to the State's using the above statement. See Johnson, 769 So.2d at 1000-01. The actual statement that the defense anticipated, however, was not the above statement, but rather the one that Smith had recorded in his February 11, 1981, notes, which was far less damaging to the defense. According to prosecutor Atkinson at the 1988 trial, Smith's statement in his notes reads as follows: "If his lawyer can prove he was crazy when he was doing all this, then he wouldn't have to do a lot of time, just go to the crazy house for about three years, because it isn’t an everyday thing to go out and blow three people away; he was just flipping out.”

. The trial court instructed the jury as follows with respect to the insanity defense:
An issue in this case is whether Paul Johnson was insane when the crimes allegedly were committed.

A person is considered to be insane when:

1. He had a mental infirmity, disease or defect.
2. Because of this condition
a. he did not know what he was doing or its consequences or
b. although he knew what he was doing or its consequences, he did not know it was wrong.
All persons are presumed to be sane. However, if the evidence causes you to have a reasonable doubt concerning the defendant’s sanity, then the presumption of sanity vanishes and the state must prove beyond a reasonable doubt that the defendant was sane.
(Emphasis added.)

. See supra note 3.

. The Lake County jury did not specify its numerical vote on the advisory sentence form, but defense counsel commented as follows at sentencing: "I would note that we did not solicit it, but during the recess, a juror member did come up to us and tell us the vote for death was a seven-to-five vote, which is, of course, the borderline of only one more than is necessary." Prosecutor Pickard was present at sentencing and did not contest this statement.

. In the proceeding below, the State contended that Johnson failed to exercise due diligence in raising his claims based on Pick-ard's notes. The trial court agreed, reasoning as follows:
The defense has been in possession of the State Attorney notes since January 1997. The defense claims that it did not know if the notes were from trial testimony or a deposition, but there were some dates on the notes that could have easily been compared to trial and deposition dates. The initials HOP were on some of the pages of the notes. This is a strong indication that Assistant State Attorney Hardy Pickard may have authored the notes, yet the defense did not ask him questions about the notes when he was questioned at the [1997] evidentiary hearing held with regard to Mr. Johnson's first Motion To Vacate.
To the extent the trial court’s ruling is based on written materials — Pickard's handwritten notes — the ruling is subject to de novo review, for this Court is just as capable as the trial court of assessing those materials. Our review of Pickard’s notes relating to James *73 Smith shows that the dates on those notes give no hint as to their purpose, for the dates do not coincide with trial or deposition dates. Also, there are no initials on several pages of those notes, and no indication whatsoever who wrote them or for what purpose. In fact, the notes appear to have been written by several persons. Key passages are cryptic. The fact that defense counsel had to send the notes to counsel in another part of the state to be deciphered attests to the notes' inscrutability and to defense counsel's diligence. Based on our review of Pickard's notes relating to James Smith, we conclude that defense counsel exercised due diligence in raising the present Giglio claim.

. We conclude that Johnson's Giglio claim with respect to Amy Reid fails to satisfy the materiality prong under Giglio; that Johnson's Brady claim fails to satisfy the prejudice prong under Brady; and that Johnson's newly discovered evidence claim fails to satisfy the second prong under Jones v. State, 709 So.2d 512 (Fla.1998). As for Johnson’s lethal injection claim, this issue has already been decid *74 ed adversely to him. See Tompkins v. State, 994 So.2d 1072, 1081 (Fla.2008), cert. denied, - U.S. -, 129 S.Ct. 1305, - L.Ed.2d - (2009); Power v. State, 992 So.2d 218, 220-21 (Fla.2008); Sexton v. State, 997 So.2d 1073, 1089 (Fla.2008); Henyard v. State, 992 So.2d 120, 129-30 (Fla.), cert. denied, -U.S.-, 129 S.Ct. 28, 171 L.Ed.2d 930 (2008); Schwab v. State, 995 So.2d 922, 924-33 (Fla.2008); Woodel v. State, 985 So.2d 524, 533-34 (Fla.), cert. denied,-U.S.-, 129 S.Ct. 607, 172 L.Ed.2d 465 (2008); Lebron v. State, 982 So.2d 649, 666 (Fla.2008); Lightbourne v. McCollum, 969 So.2d 326 (Fla. 2007), cert. denied, 553 U.S. 1059, 128 S.Ct. 2485, 171 L.Ed.2d 777 (2008); Schwab v. State, 969 So.2d 318 (Fla.2007), cert. denied, 553 U.S. 1059, 128 S.Ct. 2486, 171 L.Ed.2d 777 (2008). And as for Johnson's ABA Report claim, this issue also has already been decided adversely to him. See Tompkins, 994 So.2d at 1082-83; Power, 992 So.2d at 222-23; Rolling v. State, 944 So.2d 176, 181(Fla.), cert. denied, 549 U.S. 990, 127 S.Ct. 466, 166 L.Ed.2d 332 (2006); Rutherford v. State, 940 So.2d 1112, 1117-18 (Fla.), cert. denied, 549 U.S. 989, 127 S.Ct. 465, 166 L.Ed.2d 331 (2006).

.Cf. Ruiz v. State, 743 So.2d 1 (Fla. 1999) (reversing first-degree murder conviction due to prosecutorial misconduct); Campbell v. State, 679 So.2d 720 (Fla.1996) (reversing death sentence due to prosecutorial misconduct); King v. State, 623 So.2d 486 (Fla. 1993) (reversing death sentence due to prosecutorial misconduct); Garcia v. State, 622 So.2d 1325 (Fla. 1993) (reversing two death sentences due to prosecutorial misconduct); Nowitzke v. State, 572 So.2d 1346 (Fla. 1990) (reversing two first-degree murder convictions due to prosecutorial misconduct); Garron v. State, 528 So.2d 353 (Fla. 1988) (reversing first-degree murder conviction due to prosecutorial misconduct).

. Double jeopardy principles are not implicated here. See, e.g., Ruiz, 743 So.2d at 10 n. 11 (stating that double jeopardy principles do not bar a new trial based on prosecutorial misconduct); Keen v. State, 504 So.2d 396, 402 n. 5 (Fla.1987) ("We find no double jeopardy problem with a retrial of Keen arising from the prosecutorial misconduct here.”).