# Supreme Court of Florida

_____

No. SC13-1123
_____

**DANE P. ABDOOL, et al.,**
Petitioners,

vs.

**PAM BONDI, etc., et al.,**
Respondents.

[June 12, 2014]

LEWIS, J.

On June 14, 2013, the Governor of Florida signed into law the "Timely Justice Act of 2013" (the Act) which, according to its stated purpose, was enacted to "reduce delays in capital cases and to ensure that all appeals and postconviction actions in capital cases are resolved as soon as possible after the date a sentence of death is imposed in the circuit court." Ch. 2013-216, § 13, Laws of Fla.[1] To accomplish this objective, the Act amends and adds several provisions to Chapters 27, "State Attorneys; Public Defenders; Related Offices," 922, "Execution," and

_____

1. The Act became effective on July 1, 2013. See ch. 2013-216, § 19, Laws of Fla.

924, "Criminal Appeals and Collateral Review" of the Florida Statutes. See ch. 2013-216, Laws of Fla. The Petitioners, all of whom are inmates under a sentence of death, have filed an emergency petition requesting that this Court invoke its mandamus and all writs jurisdiction to enjoin the enforcement of four sections of the Act and to declare those sections unconstitutional.

The disputed portions of the Act can be briefly summarized as:

### Section 27.703(1): Conflict of Interest and Substitute Counsel

The Timely Justice Act modifies section 27.703(1), Florida Statutes, to require that Capital Collateral Regional Counsel (CCRC) not accept an appointment or take any action that creates an actual conflict of interest with his or her client. Ch. 2013-216, § 5, Laws of Fla. An actual conflict of interest is defined by the Act to occur when "an attorney actively represents conflicting interests. A possible, speculative, or merely hypothetical conflict is insufficient to support an allegation that an actual conflict of interest exists." Id. This amendment imposes a more stringent conflict standard than the previous statutory language, which only required that CCRC not accept an appointment that created a conflict of interest. Further, the amended statute places the responsibility of determining whether an actual conflict exists with the court, whereas the prior version of the statute required that the court appoint substitute counsel if the regional counsel of record determined that a conflict existed.

### Section 27.7045: Constitutionally Deficient Representation

Section 27.7045, a new provision created by the Act, disqualifies appointed counsel from the representation of capital defendants for five years[2] if it is determined that: (1) in two separate capital postconviction proceedings a court held that counsel provided constitutionally deficient representation; and (2) in both of those postconviction proceedings, the defendant was granted relief.  Ch. 2013-216, § 7, Laws of Fla.

### Section 27.7081: Capital Postconviction Public Records Production

Section 27.7081 delineates several requirements for the collection, storage, destruction, and requests for the production of public records in capital postconviction proceedings.  Although the statute generally mirrors Florida Rule of Criminal Procedure 3.852, the two are not identical.  Ch. 2013-216, § 8, Laws of Fla.

### Section 922.052: Issuance of Warrant of Execution

Under the prior version of section 922.052, the Governor, in his or her sole discretion, was authorized to issue a warrant to execute the sentence of death for any convicted capital defendant whose sentence was final.  See § 922.052, Fla.

---

2. The period of prohibition on representation commences at the time relief is granted after the highest court having jurisdiction to review the deficient representation determination has issued its final order and has affirmed the second such determination.  Ch. 2013-216, § 7, Laws of Fla.

Stat. (2012). The Act modifies this section in several ways. First, the Act states that the Clerk of the Florida Supreme Court "shall inform the Governor in writing certifying that a person convicted and sentenced to death, before or after the effective date of the act, has: (1) [c]ompleted [his or her] direct appeal and initial postconviction proceeding in state court, and habeas corpus proceeding and appeal therefrom in federal court; or (2) [a]llowed the time permitted for filing a habeas corpus petition in federal court to expire." Ch. 2013-216, § 12, Laws of Fla.

Second, the Act requires the Governor to issue a warrant for execution within thirty days after receiving the letter of certification from the Clerk, and to direct the warden to carry out the execution within 180 days. Id. Third, if the Governor, in his or her sole discretion, determines that the Clerk has not complied with the certification obligation with respect to any person sentenced to death, the Governor may sign a warrant of execution for such person where the executive clemency process has concluded. Id.

**JURISDICTION**

Ordinarily, the constitutionality of a legislative act should be challenged by filing an action for declaratory judgment in circuit court. Moreau v. Lewis, 648 So. 2d 124, 126 (Fla. 1995). However, when a statute will adversely impact the functions of government to the extent that it requires an immediate determination of the constitutionality of the statute, we may consider a petition that challenges

- 4 -

the constitutionality of that statute pursuant to our mandamus authority. See, e.g., Allen v. Butterworth, 756 So. 2d 52, 54-55 (Fla. 2000); Moreau, 648 So. 2d at 126; Dickinson v. Stone, 251 So. 2d 268, 271 (Fla. 1971).

We have previously stated that is our constitutional responsibility to ensure the death penalty is administered in a fair, consistent, and reliable manner, and have recognized that we have an administrative responsibility to minimize the delays inherent in the capital postconviction process. Arbelaez v. Butterworth, 738 So. 2d 326, 326-27 (Fla. 1999). Accordingly, because the challenged provisions of the Act amend and add several statutory provisions that attempt to "ensure that all appeals and postconviction actions in capital cases are resolved as soon as possible after the date a sentence of death is imposed in the circuit court," and could potentially negatively impact our ability to ensure that the death penalty is administered in a fair, consistent, and reliable manner for the Petitioners and hundreds of additional death row inmates, we treat the Petitioners' challenges to the constitutionally of the Act as a petition for writ of mandamus and exercise our discretion to accept jurisdiction. See Allen, 756 So. 2d at 54-55.

## ANALYSIS

The Petitioners challenge the facial validity of four provisions of the Act. Generally, when we review the constitutionality of a statute, we accord legislative acts a presumption of constitutionality and construe the challenged legislation to

effect a constitutional outcome when possible.  <u>Fla. Dep't of Revenue v. Howard</u>, 916 So. 2d 640, 642 (Fla. 2005).  Further, we emphasize that our review is limited. In a facial challenge, we consider only the text of the statute, not its specific application to a particular set of circumstances.  For a statute to be held facially unconstitutional, the challenger must demonstrate that no set of circumstances exists in which the statute can be constitutionally applied.  <u>See</u> <u>Fla. Dep't of Revenue v. City of Gainesville</u>, 918 So. 2d 250, 256 (Fla. 2005); <u>see also</u> <u>Cashatt v. State</u>, 873 So. 2d 430, 434 (Fla. 1st DCA 2004) ("A facial challenge to a statute is more difficult than an 'as applied' challenge, because the challenger must establish that no set of circumstances exists under which the statute would be valid.").  As a result, the Act will not be invalidated as facially unconstitutional simply because it could operate unconstitutionally under some hypothetical circumstances.  With this standard in mind, we begin our analysis with the Petitioners' separation of powers challenges to amended section 922.052.

**Section 922.052: Issuance of Warrant of Execution**

**Infringement on This Court's Rulemaking Authority**

The Petitioners first allege that amended section 922.052 directly intrudes on the constitutional authority of this Court to regulate the practice and procedure of courts in this State by creating specific time requirements that automatically require the issuance of a warrant of execution upon the completion of the

statutorily designated postconviction proceedings, and do not account for the pendency of other capital proceedings, such as successive postconviction litigation. The Petitioners further contend that because the Act truncates their ability to pursue successive postconviction litigation, it infringes on our rulemaking authority by "reject[ing] this Court's entire system of rules and case law relating to successive motions." To support these allegations, the Petitioners compare this section of the Act to the Death Penalty Reform Act (DPRA), which we held to be unconstitutional in Allen.

Article V, section 2(a), of the Florida Constitution, grants this Court the exclusive authority to adopt rules of judicial practice and procedure for actions filed in this State. See Se. Floating Docks, Inc. v. Auto-Owners Ins. Co., 82 So. 3d 73, 78 (Fla. 2012). Generally, the Legislature is empowered to enact substantive law while this Court has the authority to enact procedural law. Massey v. David, 979 So. 2d 931, 936 (Fla. 2008); see also Allen, 756 So. 2d at 59. Accordingly, a statute which creates or modifies a procedural rule of this Court violates article II, section 3, of the Florida Constitution, which prohibits one branch of government from exercising any powers appertaining to either of the other branches unless expressly permitted by the constitution. See State v. Raymond, 906 So. 2d 1045, 1048 (Fla. 2005). Because the distinction between substantive laws and procedural

rules is not always clear, this Court has provided the following guidelines to determine whether a statute is procedural or substantive in nature:

> Substantive law has been defined as that part of the law which creates, defines, and regulates rights, or that part of the law which courts are established to administer. It includes those rules and principles which <u>fix and declare the primary rights of individuals with respect towards their persons and property</u>. On the other hand, <u>practice and procedure</u> "encompass the <u>course, form, manner, means, method, mode, order, process or steps by which a party enforces substantive rights</u> or obtains redress for their invasion. 'Practice and procedure' may be described as the machinery of the judicial process as opposed to the product thereof." It is the method of conducting litigation involving rights and corresponding defenses.

<u>Massey</u>, 979 So. 2d at 936-37 (quoting <u>Haven Fed. Sav. & Loan Ass'n v. Kirian</u>, 579 So. 2d 730, 732 (Fla. 1991)).

In <u>Allen</u>, we concluded that the DPRA drastically modified postconviction death penalty procedures because it created a "dual-track" postconviction process, in which death-sentenced inmates were required to file postconviction claims almost contemporaneously with their direct appeals. 756 So. 2d at 55. As in <u>Allen</u>, we recognize that the Legislature enacted the Timely Justice Act with the intent to improve the efficiency of capital cases. However, simply because the Timely Justice Act and the DPRA share a similar purpose does not render the warrant issuance provision of the Act unconstitutional. To the contrary, amended section 922.052 is materially distinguishable from the unconstitutional provisions of the DPRA.

In Allen, we explained that the DPRA expressly: (1) barred postconviction actions unless a fully pled motion was filed within 180 days of the filing of the initial appellate brief; (2) implemented a number of restrictions on postconviction procedures, including no extensions of time based upon the pendency of public records requests or litigation, and no tolling of the time for commencement of a postconviction action for any reason or cause; and (3) limited significantly the claims that could be raised in a successive motion. Id. at 56. We held the statute to be unconstitutional because these statutory modifications directly and substantially altered the procedural rules adopted by this Court for capital postconviction proceedings. Id. at 55. In contrast, section 922.052 merely addresses matters related to the issuance of a warrant for execution. This is a purely executive function, and the amended statute, therefore, does not directly change, alter, or abolish any procedural rules of this Court.

Moreover, the Act also does not directly restrict or regulate the procedural mechanisms of the judicial process because it does not alter the timelines of capital postconviction proceedings. Cf. Allen, 756 So. 2d at 55 (noting that the "DPRA significantly changes Florida's capital postconviction procedures."). While section 922.052 does require the Clerk of this Court to certify that a capital defendant has completed certain postconviction proceedings, that certification is only one of at least three factors that impact the warrant issuance process.

First, although the Act requires that the Clerk of the Florida Supreme Court certify to the Governor when a capital defendant has completed the requisite postconviction proceedings, the Act does not impose a deadline on the Clerk as to when the certification must be made. In fact, the State acknowledged this fact in its brief, noting that "[t]here is no time frame in which the Clerk is required to act and no enforcement provision if the Clerk fails to act."

Second, if the Governor determines that the Clerk of this Court has not provided the information contained in the records, he or she retains the sole discretion to issue a warrant of execution in any capital case where the executive clemency process has been completed. Again, there is no time frame in the statute that dictates when the Governor must decide if the Clerk has or has not provided information concerning the status of a case. Thus, if the Clerk has not reported that a defendant has completed the requisite postconviction proceedings, the Governor is under no statutory obligation to issue a warrant.

Third, even if the Clerk does provide information to the Governor concerning the status of a defendant's case, this certification alone does not mandate the signing of a warrant. Rather, the plain language of amended section 922.052 demonstrates that no warrants can be signed unless the executive clemency process has concluded. The statute does not, nor could it, place time limitations on the expediency or completion of the clemency process, which is a

- 10 -

process that rests entirely within the unfettered discretion of the Governor.  See

Parole Com'n v. Lockett, 620 So. 2d 153, 154-55 (Fla. 1993) ("[T]he clemency

process is derived solely from the constitution and is strictly an executive branch

function, and [], consequently, the Legislature, by statute, may neither preempt nor

overrule the clemency rules without violating the separation of powers doctrine.").

Consequently, the warrant issuance provision of the Act does not mandate the

issuance of a warrant immediately after the conclusion of the initial postconviction

proceedings and is distinguishable from the provisions of the DPRA held to be

unconstitutional in Allen.[3]

As the above analysis demonstrates, the warrant issuance provision of the

Act is distinguishable from the DPRA and is not facially unconstitutional because

it narrowly modifies only those procedures associated with the issuance of

warrants.  The Act does not facially intrude on the constitutional authority of this

---

3. Before section 922.052 was modified by the Act, the statute did not require the Governor to complete clemency proceedings before signing a warrant, and the Governor was authorized to issue a warrant at any time after the receipt of a certified copy of a capital defendant's conviction and sentence.  See § 922.052, Fla. Stat. (2012); see also Cave v. State, 529 So. 2d 293, 299 (Fla. 1988) (holding that this Court has "no constitutional authority to abrogate the Governor's authority to issue death warrants on death sentenced prisoners whose convictions are final. Unless there is a petition for post-conviction relief, the affirmance of a final conviction ends the role of the courts.").  The Governor could, therefore, issue a warrant any time after a capital inmate's conviction and sentence became final without any concession for successive or postconviction litigation that was not pending before a court in this State.  Thus, by modifying section 922.052, the Act has not eliminated any statutory right to file successive postconviction motions, because that right did not exist under the prior version of the statute.

- 11 -

Court to regulate the practice and procedure of Florida courts, nor does it attempt to impact or modify this Court's constitutional responsibility to enter stays in capital proceedings when necessary and proper, either before or after a warrant is signed. Nothing in the Act nor in this opinion even remotely hints at the possibility that the Act has modified or altered this Court's ability to stay capital proceedings.

### Legislative and Gubernatorial Oversight

The Petitioners next contend that amended section 922.052 unconstitutionally empowers the Legislature to direct the Clerk of this Court to certify to the Governor when a capital defendant has completed requisite postconviction proceedings. According to the Petitioners, this purported mandate violates article V, section 3(c), of the Florida Constitution, which provides that this Court "shall appoint a clerk . . . who shall hold office during the pleasure of the court and perform such duties as the court directs."

In addressing the constitutionality of a legislative enactment, this Court has previously noted that

> unless legislation be clearly contrary to some express or necessarily implied prohibition found in the Constitution, the courts are without authority to declare legislative Acts invalid. The Legislature may exercise any lawmaking power that is not forbidden by organic law.

Chiles v. Phelps, 714 So. 2d 453, 458 (Fla. 1998) (quoting Savage v. Bd. of Pub. Instruction, 133 So. 341, 344 (1931)). "Absent a constitutional limitation, the

- 12 -

Legislature's 'discretion reasonably exercised is the sole brake on the enactment of legislation.' " Bush v. Holmes, 919 So. 2d 392, 406 (Fla. 2006) (quoting State v. Bd. of Pub. Instruction, 170 So. 602, 606 (1936)). While we are charged with the constitutional responsibility to oversee and direct the Clerk, we conclude that nothing in article V, section 3(c), prohibits the Legislature from placing limited information collection and sharing responsibilities on the Clerk, as long as those responsibilities do not interfere or conflict with the duties imposed by this Court. See Chiles, 714 So. 2d at 458. The Legislature has previously utilized its discretion to direct the Clerk to collect and disclose information to other branches of government. For example, section 25.241 directs the Clerk in several ways:

> (2) The Clerk of the Supreme Court is authorized to employ such deputies and clerical assistants as may be necessary. . . .
>
> (3)(a) The Clerk of the Supreme Court is hereby required to collect, upon the filing of a certified copy of a notice of appeal or petition, $300 for each case docketed, and for copying, certifying, or furnishing opinions, records, papers, or other instruments, except as otherwise herein provided, the same fees that are allowed clerks of the circuit court; however, no fee shall be less than $1. . . . From each attorney appearing pro hac vice, the Clerk of the Supreme Court shall collect an additional fee of $100 to be deposited into the General Revenue Fund.
>
> (b) Upon the filing of a notice of cross-appeal, or a notice of joinder or motion to intervene as an appellant, cross-appellant, or petitioner, the Clerk of the Supreme Court shall charge and collect a filing fee of $295. . . .
>
> (4) . . . Copies of opinions, orders, and decrees shall be furnished in all cases to each attorney of record;

- 13 -

(5)  <u>The Clerk of the Supreme Court is hereby required to prepare a statement of all fees collected each month and remit such statement, together with all fees collected by him or her, to the Chief Financial Officer.</u>

§ 25.241, Fla. Stat. (2013) (emphasis supplied).  Similarly, other statutes, such as section 25.211, provide that the Clerk shall maintain his or her office in the Supreme Court building and keep "[a]ll books, papers, records, files, and the seal of the Supreme Court" in the Office of the Clerk.  See § 25.211, Fla. Stat. (2013); § 25.221, Fla. Stat. (2013).  The Legislature has also required the Clerk to maintain registries of certain types of individuals, such as vexatious litigants.  See § 68.093, Fla. Stat. (2013).  While these statutes do not address capital litigation, they do demonstrate that the Legislature retains the authority to direct the Clerk to collect information for the benefit of other branches of government.

Amended section 922.052(2)(a) essentially requires the Clerk of the Florida Supreme Court to maintain a tracking and notification system that monitors the progress of capital appeals and to share that information with the Governor.  See Ch. 2013-216, § 12, Laws of Fla.  This Court has previously examined whether a statute interferes with a rule of procedure or judicial process in violation of the separation of powers clause.  See Jackson v. Fla. Dep't of Corrs., 790 So. 2d 381, 385 (Fla. 2000) (holding that a statute violated the separation of powers clause because it interfered with and intruded upon the "procedures and processes of this

Court and conflicts with this Court's own rule regulating the procedure for indigency determinations"); see also Times Pub. Co. v. Ake, 660 So. 2d 255, 257 (Fla. 1995) ("We should emphasize that this Court has exercised its authority and directly addressed its responsibility in this area."). Here, however, this Court has not promulgated a rule or exercised its authority to regulate the tracking and sharing of information related to capital proceedings by the Clerk of this Court. The statute places no requirement on the Clerk to monitor the substance of claims raised, and the tracking system does not impact the procedure or the merits of these cases. Thus, not only is this statutory directive consistent with prior information collection and sharing responsibilities assigned to the Clerk by the Legislature in other statutes—see, e.g., § 25.241(5), Fla. Stat. (2013) (directing the Clerk to provide financial records to the Chief Financial Officer)—but the tracking system is not directly related to the procedural operations of the court system and does not interfere with "the course, form, manner, means, method, mode, order, process or steps by which a party enforces substantive rights or obtains redress for their invasion." Kirian, 579 So. 2d at 732.

Furthermore, the cases referenced by the Petitioners to support the claim that section 922.052 violates the separation of powers are factually distinguishable because they do not address legislative infringement upon the responsibilities of the Clerk of this Court. See Ake, 660 So. 2d at 257 (holding that the clerks of the

- 15 -

circuit courts are subject to the oversight and control of the Supreme Court of Florida, rather than the legislative branch); Johnson v. State, 336 So. 2d 93, 95 (Fla. 1976) (invalidating a statute that mandated the destruction of judicial records). Thus, without a clear indication in the Florida Constitution, the Florida Statutes, or decisional law that the Legislature is prohibited from requiring the Clerk to monitor the status of capital defendants' appeals and share those results with the Governor, we conclude that the statute on its face is a valid exercise of legislative authority. See Chiles, 714 So. 2d at 458.

The Petitioners additionally contend that the Act unconstitutionally empowers the Governor to oversee and direct the Clerk because it permits the Governor to sign warrants after he or she has determined that the Clerk has failed to comply with the certification requirements. We disagree. Section 922.052(2)(c) states that if the Governor determines that the Clerk has not complied with the certification obligation, then "the Governor may sign a warrant of execution for such person where the executive clemency process has concluded." See ch. 2013-216, § 12, Laws of Fla. The plain language of this provision does not permit the Governor to direct or supervise the Clerk in any way. When the Clerk determines that the status of a capital defendant's case is within the statutory requirements for certification, the Act does not provide the Governor with the authority to challenge, correct, expedite, or alter any certification. Even when the Clerk fails to

provide the information that a capital defendant has completed the requisite postconviction proceedings, the Governor lacks any authority to direct the Clerk to complete that certification. The Act instead provides a statutory mechanism by which the Governor may issue warrants in the event that the Clerk of this Court fails to provide the status information that a capital defendant has completed the requisite postconviction proceedings.

Accordingly, we conclude that amended section 922.052 does not unconstitutionally infringe on this Court's power to direct the duties of the Clerk or authorize the Governor to give the Clerk directives or pass on the quality of the Clerk's performance.

### The Governor's Authority to Issue Warrants

The Petitioners' final separation of powers claim alleges that the warrant issuance provision of the Act unconstitutionally infringes on the Governor's clemency power and unfettered discretion to issue warrants by mandating that the Governor must sign a warrant once the Clerk issues a certification. There are two provisions in the Act that direct the Governor to perform certain actions within designated time limits, and we conclude that neither provision amounts to a separation of powers violation.

First, section 922.052(2)(b) provides that the Governor shall issue a warrant for execution within thirty days of receiving certification from the Clerk, if the

clemency process has concluded.  This provision reflects that two conditions must be satisfied for the thirty-day provision to apply: (1) a certification by the Clerk; and (2) the completion of the clemency process.  Since the latter condition is exclusively within the control and discretion of the executive branch and contains no mandated time frame for completion, we conclude the Governor's discretion in issuing warrants is not curtailed by the Act, even when the first condition is satisfied.  See Carroll v. State, 114 So. 3d 883, 888 (Fla.) ("The clemency process in Florida derives solely from the Florida Constitution and [this Court has] recognized that the people of the State of Florida have vested 'sole, unrestricted, unlimited discretion exclusively in the executive in exercising this act of grace.' " (quoting Sullivan v. Askew, 348 So. 2d 312, 315 (Fla. 1977))), cert. denied, 133 S. Ct. 2762 (2013).

Second, section 922.052(2)(b) provides that after the Governor has issued a warrant, he or she must direct the warden to execute the sentence within 180 days.  Over eighty years ago, this Court recognized that "[t]here being no regulation of the subject contained in the Constitution, it is within the province of the [Legislature] to provide the method, the means, and the instrumentalities for executing death sentences imposed by the courts pursuant to the law."  Blitch v. Buchanan, 131 So. 151, 155 (Fla. 1930).  Pursuant to this principle, the Legislature has regulated the method, means, instrumentalities, and imposition of the execution

of the death penalty in several statutes. See, e.g., § 921.141, Fla. Stat. (2013) (establishing procedures for the imposition and administration of the death penalty); § 922.06, Fla. Stat. (2013) (establishing procedures for a stay of execution); § 922.10, Fla. Stat. (2013) (establishing means by which a death sentence shall be executed); § 922.105(1), Fla. Stat. (2013) (requiring that a "death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution"); § 922.11, Fla. Stat. (2013) (authorizing the warden to set the date of the execution within the week designated by the Governor; establishing the method of how the execution shall be conducted and who is required to attend); see also In re Advisory Op. to Governor, 19 So. 2d 370, 372 (Fla. 1944) (holding that the Legislature may, by statute, require the Governor to provide at least five days between the issuance of the warrant and the beginning of the scheduled week of execution). We conclude that the 180-day execution requirement constitutes a reasonable time frame applicable to the process of executing the sentence of death and is consistent with the previously discussed Legislative authority with regard to the administration of the death penalty. We also conclude the Act does not infringe on the Governor's clemency power or unfettered discretion to issue warrants, and that this claim lacks merit.

**Due Process**

The Petitioners next allege that section 922.052 violates due process, equal protection, and the Eighth Amendment ban on cruel and unusual punishment. To assess whether a violation of due process has occurred, we must first decide whether the complaining party has been deprived of a constitutionally protected liberty or property interest. Econ. Dev. Corp. of Dade Cnty., Inc. v. Stierheim, 782 F.2d 952, 953-54 (11th Cir. 1986). Absent such a deprivation, there can be no denial of due process. Id. Due process is a flexible concept and requires only that the proceeding be essentially fair. See Carillon Cmty. Residential v. Seminole Cnty., 45 So. 3d 7, 9 (Fla. 5th DCA 2010) (citing Gilbert v. Homar, 520 U.S. 924, 930 (1997)). The extent of procedural due process protection varies with the character of the interest and the nature of the proceeding involved. Id. As a result, there is no single test which applies to determine whether the requirements of procedural due process have been met. Id. Courts instead consider the individualized facts of each case to determine whether the defendant has been accorded the process which the state and federal constitutions demand. Id.

The Petitioners contend that amended section 922.052 violates due process because it restricts successive postconviction proceedings by creating a "time-certain deadline for execution." This claim lacks merit because, as explained above, the Act does not create a time-certain deadline that mandates the issuance of a warrant automatically after a capital defendant completes the relevant

postconviction proceedings. The issuance of a warrant is dependent on several procedures that do not have fixed deadlines, and nothing in the statute prevents capital defendants from presenting successive postconviction motions before these procedures have been completed. Accordingly, we conclude that the Act does not deprive the Petitioners of a constitutionally protected liberty or property interest and reject this claim.

The Petitioners next contend that section 922.052 violates due process because the Act imprecisely describes capital postconviction procedures and fails to contemplate the complexity of these proceedings. According to the Petitioners, this imprecision creates a higher probability that there will be errors in the tracking system, which may lead to erroneous certifications, rendering the Clerk's statutory responsibility "untenable." The Petitioners also contend that the Act violates due process because it fails to provide capital defendants with the opportunity to be heard with respect to the status of their appeals.

The tracking and certification process is not a judicial proceeding because it requires only the collection and sharing of the status of capital cases. It does not impact the merits or substance of any case, and, therefore, does not implicate due process. Further, the Petitioners have not demonstrated that the certification process deprives them of a constitutionally protected liberty or property interest to which they are entitled.

Moreover, while capital postconviction proceedings may occasionally involve complex circumstances, the language of the statute provides specific direction to the Clerk to monitor and track the status of a capital proceeding and places the responsibility of determining when a capital defendant has completed the appropriate proceedings with the Clerk, who is more than capable of tracking state and federal court proceedings. If the Clerk is unsure whether a capital defendant has completed a certain proceeding, he or she can inquire further into the status of the capital defendant's postconviction proceedings and withhold certification when necessary. Further, in the event that a capital defendant is erroneously placed on the certification list, nothing in the statute prohibits the Clerk from notifying the Governor that the certification was made in error and removing the name of the defendant from the list.

We reiterate that in a facial challenge, we consider only the text of the statute, not its application to a particular set of circumstances. Accordingly, we refuse to join the Petitioners in concocting elaborate hypothetical situations under which the Act could operate unconstitutionally, and hold that this due process challenge lacks merit. See City of Gainesville, 918 So. 2d at 256.

The Petitioners next contend that the Act cuts off certiorari review of their convictions by the United States Supreme Court. We disagree. As noted above, the statute specifically provides that no capital defendant will be executed unless

- 22 -

executive clemency proceedings have concluded.  <u>See</u> Ch. 2013-216, § 12, Laws

of Fla.  Further, section 940.03 provides that the executive clemency process in a

capital case is initiated by the defendant, and "must be filed within 1 year after the

date the [Florida] Supreme Court issues a mandate on a direct appeal <u>or the United</u>

<u>States Supreme Court denies a petition for certiorari, whichever is later</u>."  § 940.03,

Fla. Stat. (2013) (emphasis supplied).  When read together, section 940.03 and

amended section 922.052 demonstrate that the warrant issuance procedures under

the Act cannot cut off certiorari review by the United States Supreme Court

because: (1) the Act prohibits the issuance of warrants of execution until the

clemency process is completed; and (2) section 940.03 specifically permits the

defendant to <u>apply</u> for clemency <u>after</u> the defendant has petitioned, and received a

response from, the Supreme Court regarding certiorari review.  Accordingly, this

claim lacks merit.

The Petitioners next contend that the Act violates due process because it

diminishes the availability of process by overburdening the court system.  The

Petitioners fail to provide any argument as to how the Act has overburdened or will

overburden the courts to such an extent that the Act will violate constitutionally

protected due process rights.  Therefore, we reject this conclusory and speculative

allegation.  <u>See</u> <u>Shere v. State</u>, 742 So. 2d 215, 217 n.6 (Fla. 1999).

**Equal Protection**

- 23 -

The Equal Protection Clause of the United States Constitution protects classes and individuals from being treated arbitrarily without a legitimate justification. Clements v. Fashing, 457 U.S. 957, 963 (1982). However, the Equal Protection Clause allows States considerable leeway to enact legislation that may appear to affect similarly situated people differently. Id. Unless a classification warrants heightened review because it jeopardizes the exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification be rationally related to a legitimate state interest. Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). The party that alleges that a statute violates equal protection bears the burden to demonstrate that there is no rational basis for the classification. Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 367 (2001).

The Petitioners rely predominantly on Allen to contend that the amendment to section 922.052 violates equal protection. In Allen, we noted that "[t]he successive motion standard of the DPRA . . . applies only to capital prisoners in violation of the principles of equal protection." 756 So. 2d at 54. However, Allen was decided on separation of powers grounds. Id. at 59. Further, as previously explained, the Act is distinguishable from the unconstitutional provision in the DPRA and does not unconstitutionally limit the number or type of postconviction

motions that a capital defendant may file.  Accordingly, our holding in <u>Allen</u> does not lend support to the Petitioners' equal protection claim.

The crux of the Petitioners' equal protection claim is that amended section 922.052 restricts the time in which a capital defendant may file postconviction motions, whereas non-capital defendants have no such restriction on the filing of their postconviction motions.  This argument is substantially similar to the Petitioners' previous separation of powers argument that amended section 922.052 creates a time-certain deadline after which a warrant must be signed, thereby restricting the time in which they may file successive motions.  However, because the amended statute does not create a time-certain deadline or otherwise limit the time in which successive motions may be filed, we conclude that equal protection is not implicated, and the amendment to section 922.052 does not unjustifiably treat capital defendants differently than non-capital defendants.

Furthermore, even if we were to find that equal protection is implicated, there is no constitutional violation.  The State has a legitimate interest in ensuring that capital sentences are carried out in a timely manner.  <u>Wainwright v. Booker</u>, 473 U.S. 935, 937 (1985); <u>see also</u> <u>Baze v. Rees</u>, 553 U.S. 35, 61 (2008).  Further, death sentences are necessarily different than other sentences.  Unlike incarcerative sentences, which are carried out over a period of time, a death sentence is not accomplished until execution.  Thus, defendants who have been convicted and

sentenced to death are necessarily treated differently.  <u>Compare</u> Fla. R. Crim. P. 3.851, <u>with</u> Fla. R. Crim. P. 3.850.  Accordingly, we conclude that the Act bears a rational relationship to a legitimate state purpose and hold that there is no equal protection violation.

The Petitioners next allege that the amendment to section 922.052 violates equal protection because it denies capital defendants whose initial proceedings will be completed after the effective date of the Act the same opportunity to present successive motions as is provided to capital defendants who completed their initial proceedings before the effective date of the Act.  However, the Legislature is permitted to prospectively alter statutory rights and remedies.  <u>Cf.</u> <u>State Farm Mut. Auto. Ins. Co. v. Laforet</u>, 658 So. 2d 55, 61 (Fla. 1995).  When the Legislature amends a statute, its future application is necessarily different than the application of the law in its prior form.  To hold that a change in the law violates equal protection simply because it is applied prospectively would inhibit the Legislature from exercising its prerogative to articulate policy and amend laws.  Accordingly, we hold that the Act does not violate the Equal Protection Clause.

### Cruel and Unusual Punishment

The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment and is applicable to the criminal process in three ways:

[f]irst, it limits the kinds of punishments that can be imposed on those convicted of crimes . . . ; second, it proscribes punishment grossly disproportionate to the severity of the crime . . . ; and third, it imposes substantive limits on what can be made criminal and punished as such[.]

Ingraham v. Wright, 430 U.S. 651, 667 (1977) (internal citations omitted). In short, the Eighth Amendment restricts the circumstances under which the death penalty may be imposed and the manner in which the death penalty may be carried out. See Furman v. Georgia, 408 U.S. 238, 241 (1972). Amended section 922.052 does not impose a punishment, delineate the crimes for which the death penalty may be imposed, or prescribe the method of execution. Rather, the Act governs the administrative procedure under which a death warrant is issued. Therefore, we conclude that the amendment to section 922.052 does not implicate or violate the Eighth Amendment to the United States Constitution.

**Section 27.7045: Constitutionally Deficient Representation**

In this claim, the Petitioners allege that section 27.7045 unconstitutionally encroaches on the exclusive jurisdiction of this Court to "regulate the admission of persons to the practice of law and the discipline of persons admitted." Art. V, § 15, Fla. Const. The disputed section of the Act states, in full:

Section 7. Section 27.7045, Florida Statutes, is created to read:

27.7045: Capital case proceedings; constitutionally deficient representation. Notwithstanding another provision of law, an attorney employed by the state or appointed pursuant to s. 27.711 may not represent a person charged with a capital offense at trial or on direct

> appeal or a person sentenced to death in a postconviction proceeding if, in two separate instances, a court, in a capital postconviction proceeding, determined that such attorney provided constitutionally deficient representation and relief was granted as a result. This prohibition on representation shall be for a period of 5 years, which commences at the time relief is granted after the highest court having jurisdiction to review the deficient representation determination has issued its final order affirming the second such determination.

Ch. 2013-216, § 7, Laws of Fla. This provision disqualifies an attorney employed by the State or appointed by a court pursuant to section 27.711 from the representation of capital defendants for five years if: (1) in two separate capital postconviction proceedings, a court holds that State employed or appointed counsel provided constitutionally deficient representation; and (2) in both of those postconviction proceedings the capital defendant was granted relief.

As previously noted, article II, section 3, of the Florida Constitution provides that "[n]o person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." This provision encompasses two fundamental prohibitions. See Chiles v. Children A, B, C, D, E, & F, 589 So. 2d 260, 264 (Fla. 1991). The first is that no branch may encroach upon the powers of another. Id. The second is that no branch may delegate to another branch its constitutionally assigned power. Id. However, the separation of powers doctrine does not contemplate that every governmental activity must be classified as belonging exclusively to a single branch. See State v. Johnson, 345 So. 2d 1069, 1071 (Fla. 1977). Rather, a branch of government is

prohibited from the exercise of power that has been constitutionally assigned

exclusively to another branch.  State v. Palmer, 791 So. 2d 1181, 1183 (Fla. 1st

DCA 2001), rev. denied, 817 So. 2d 849 (Fla. 2002).

Nearly fifty years ago, this Court in The Florida Bar v. Massfeller, 170 So.

2d 834, 838 (Fla. 1964), noted that:

> The power of courts to discipline attorneys at law is as ancient as the
> common law itself. . . .  The Courts . . . have from time immemorial,
> both in England and in this country, exercised as authority inherent in
> them, and without question, the right and power to discipline members
> of the Bar practicing before them.  The constitutional power contained
> in Art. V, Sec. [15] of the Florida Constitution is but a recognition of
> this already existing authority of the Florida Courts.  The
> independence of the Courts [from] the other two coordinate and equal
> branches of our state government does not permit [] any interference
> by either of said branches in the exercise by the Courts of this state of
> their inherent and constitutional power to discipline members of the
> Bar.  Any statute enacted by the Legislature which attempted to do so
> would of necessity be stricken down as unconstitutional.

While this Court retains exclusive constitutional authority to regulate the

admission and discipline of individuals who are admitted to the Bar, the

Legislature also possesses the inherent authority to regulate some aspects of legal

representation.  For example, the Legislature may, under its police power, choose

to criminalize conduct that also falls within the disciplinary authority of this Court.

See Pace v. State, 368 So. 2d 340, 345 (Fla. 1979) ("Under the police power the

legislature may enact penal legislation that affects the legal profession just as it can

with regard to other occupations and professions.").  In addition, this Court has

previously recognized that the Florida Constitution does not restrict the Legislature from establishing a system of court-appointed counsel to handle the public defender's conflict cases. See Crist v. Fla. Ass'n of Criminal Defense Lawyers, Inc., 978 So. 2d 134, 141 (Fla. 2008). Thus, the Legislature has created by statute the offices of CCRC and the Office of Criminal Conflict and Civil Regional Counsel (RCC) and has established the registry counsel appointment system. See §§ 27.40, 27.511, 27.701, Fla. Stat. (2013). The Legislature also has delineated the qualifications and duties of these attorneys.

The plain language of section 27.7045 reflects that the Legislature intended for the five-year prohibition to apply to all "attorney[s] employed by the state or appointed pursuant to s. 27.711," which includes four groups of court-appointed counsel: (1) the public defender; (2) CCRC; (3) RCC; and (4) appointed registry counsel. Ch. 2013-216, § 7, Laws of Fla. To properly address this claim, it is necessary to briefly address the differences between the origin and qualifications of the four groups.

The Office of the Public Defender was established by the Florida Legislature in 1963. See Pub. Defender, Eleventh Judicial Circuit of Fla. v. State, 115 So. 3d 261, 267 (Fla. 2013); see also ch. 63-409, § 1, Laws of Fla. (enacting section 27.50, Florida Statutes (1963), which created the Office of the Public Defender). The Legislature subsequently approved a proposal to amend the Florida

Constitution and elevate the Office of the Public Defender to a constitutional office, which was approved by the electorate in 1972.  See id.; see also art. V, § 18, Fla. Const.  The qualifications of the public defender are constitutionally enumerated in article V, section 18, of the Florida Constitution, which states:

> In each judicial circuit a public defender shall be elected for a term of four years, who shall perform duties prescribed by general law.  A public defender shall be an elector of the state and reside in the territorial jurisdiction of the circuit and shall be and have been a member of the Bar of Florida for the preceding five years.  Public defenders shall appoint such assistant public defenders as may be authorized by law.

See also Crist, 978 So. 2d at 142.  Article V, section 18, grants the Legislature the authority to statutorily regulate the duties to be performed by the public defender, which includes the types of cases for which public defenders may be appointed.  Id. at 141; see also § 27.51, Fla. Stat. (2013).  Unlike the elected public defender, the registry counsel appointment system and the offices of CCRC and RCC are purely statutory entities.  See § 27.40(2)(b), Fla. Stat. (2013) ("[p]rivate counsel appointed by the court to provide representation shall be selected from a registry of individual attorneys maintained under this section"); § 27.701, Fla. Stat. (2013) ("[t]here are created three regional offices of capital collateral counsel . . ."); § 27.511(1), Fla. Stat. (2013) ("an office of criminal conflict and civil regional counsel is created within the geographic boundaries of each of the five district courts of appeal").  Because they are created by statute, the Legislature has the

authority to establish the qualifications and duties of (not the elected public defender) registry counsel, CCRC, and RCC, and those qualifications are not within the purview of this Court. See §§ 27.40(3)(a), 27.511(3)(a), 27.701, Fla. Stat. (2013).[4]

The differing origin of these four groups is constitutionally significant because statutes that impose additional qualifications for office are unconstitutional where the Florida Constitution itself established those requirements. Crist, 978 So. 2d at 142 (quoting State ex rel. Askew v. Thomas, 293 So. 2d 40, 42 (Fla. 1974)). We further held in Crist that the Legislature is prohibited from adding to the disqualifications of a constitutional office, where the limitations and qualifications of that office are specifically expressed in the constitution. 978 So. 2d at 142; see also Maloney v. Kirk, 212 So. 2d 609, 612 (Fla. 1968); In re Investigation of a Circuit Judge of the Eleventh Judicial Circuit of Fla., 93 So. 2d 601, 604 (Fla. 1957). For the overwhelming majority of attorneys included in the class of

_____

4. While the Legislature retains the power to enumerate the duties of the public defender, the five-year prohibition created by the Act cannot be considered a duty. A "duty" is defined as "obligatory tasks, conduct, service, or functions that arise from one's position," while a "qualification" is defined as "a condition or standard that must be complied with." See Merriam-Webster Collegiate Dictionary 360, 955 (10th ed. 1996). While the statute has the effect of limiting the tasks or functions a court-appointed attorney may perform, the statute itself does not directly affect an attorney's duties. Rather, it operates as a condition which, upon application, precludes an attorney from performing certain duties in a specific area of the law.

"attorney[s] employed by the state or appointed pursuant 27.711" to whom the disqualification provision of section 27.7045 applies, the statute merely modifies their statutorily enumerated qualifications. However, while the Legislature may statutorily modify the qualifications of registry counsel, CCRC, and RCC by statute, it may not alter the constitutionally enumerated qualifications or disqualifications of the public defender. See Crist, 978 So. 2d at 142.[5]

We reiterate that this is a facial challenge and that it is our responsibility to accord legislative acts a presumption of constitutionality and to construe challenged legislation to effect a constitutional outcome whenever possible. Howard, 916 So. 2d at 642. Therefore, although this provision operates to disqualify state-employed and registry attorneys from representing capital defendants, we conclude that the disqualification provision of section 27.7045 does not facially violate the constitution because we conclude that the Legislature intended for the statutory disqualification provision to apply to all state-employed attorneys, but not to the twenty elected public defenders, whose qualifications are defined by the Florida Constitution.[6]

---

5. The Florida Constitution requires that a public defender be elected in each of the twenty judicial circuits. See art. V, § 18, Fla. Const.

6. We further conclude that the disqualification provision of section 27.7045 applies to assistant public defenders because their qualifications are not constitutionally enumerated.

**Section 27.7081: Capital Postconviction Public Records Production**

The Petitioners next contend that the Legislature intended for amended section 27.7081 to displace Florida Rule of Criminal Procedure 3.852, which governs capital postconviction public records production, and therefore assert that the statute encroaches upon the exclusive authority of this Court to adopt rules of practice and procedure. The Petitioners also contend that the amended statute violates due process because it omits provisions of the rule that provide capital defendants with hearings and supplemental records.

The power to enact procedural law rests exclusively with this Court. See art. V, § 2(a), Fla. Const. ("The supreme court shall adopt rules for the practice and procedure in all courts. . . ."); see also Johnson, 336 So. 2d at 95 ("[T]he Constitution establishes judicial power in the court system and vests this Court with the power of administration of the court system, including the establishment of judicial rules of practice and procedure; while such rules may be repealed by a general law enacted by a two-thirds vote of the Legislature, the power to initiate them rests in this Court."). Thus, when a statute is clearly substantive and "operates in an area of legitimate legislative concern," the statute does not constitute an unconstitutional encroachment on the judicial branch. See Massey, 979 So. 2d at 937 (quoting Caple v. Tuttle's Design-Build, Inc., 753 So. 2d 49, 54 (Fla. 2000)). However, when this Court has promulgated rules of practice and

procedure, and a statute provides a contrary practice or procedure, the statute is unconstitutional to the extent of the conflict. Id. at 937 (we disapprove Salvador v. Fennelly, 593 So. 2d 1091, 1093 (Fla. 4th DCA 1992), to the extent that it is inconsistent with our decision today); see also Kirian, 579 So. 2d at 732.

Section 27.7081 is substantially similar to Florida Rule of Criminal Procedure 3.852. The majority of the statute uses the same language or contains minor, non-substantive changes to the language of the rule. However, there are multiple portions of the amended statute that substantively differ from the rule. For example, the amended statute does not contain the language in subdivision (h) of rule 3.852, which is titled "Cases in Which Mandate was Issued Prior to Effective Date of Rule." Fla. R. Crim. P. 3.852(h). This subdivision delineates the procedures that apply to defendants whose convictions and sentences of death were imposed prior to October 1, 1998, and provides the procedure under which collateral counsel may request the production of supplemental public records after the signing of a warrant of execution for those defendants. Id. Despite the absence of language in amended section 27.7081, the corresponding provision of rule 3.852 is not affected by the Act. Amended section 27.7081(2) provides that the statute

> shall not be a basis for renewing public records requests that have been initiated previously or for relitigating issues pertaining to production of public records upon which a court has ruled before July 1, 2013. Public records requests made in postconviction proceedings in capital cases in which the conviction and sentence of death have

been affirmed on direct appeal before July 1, 2013, shall be governed by the rules and laws in effect immediately before July 1, 2013.

See ch. 2013-216, § 8, Laws of Fla. Therefore, because rule 3.852(h) applies only to cases in which a defendant's conviction and sentence of death was imposed prior to October 1, 1998, the amended statute will not apply in any case in which the production of supplemental records is governed by rule 3.852(h). See Fla. R. Crim. P. 3.852(h).

However, certain subdivisions of the rule overlap with the amended statute. First, section 27.7081(8)(c), titled "Demand for Additional Public Records," states: "Within 60 days after receipt of the written demand, a person or agency may file with the trial court an objection to the written demand described in paragraph (a). The trial court may order a person or agency to produce additional public records if the court determines that [the listed requirements are met]." Ch. 2013-216, § 8, Laws of Fla. However, the corresponding portion of rule 3.852 states: "Within 60 days of receipt of the written demand, any person or agency may file with the trial court an objection to the written demand described in subdivision (g)(1). The trial court shall hold a hearing and issue a ruling within 30 days after the filing of any objection, ordering a person or agency to produce additional public records if the court determines that each of the following exists . . . ." Fla. R. Crim. P. 3.852(g)(3) (emphasis supplied). The emphasized portion of the rule, which requires the trial court to hold a hearing if the person or entity in possession of the

public record objects, is absent from the statute.   Further, the time limitation for the hearing and ruling is also absent from the statute.

Next, subsection (12)(b), titled "Scope of Production and Resolution of Production Issues," states: "Counsel for a party objecting or moving to compel production of public records pursuant to this section must file a copy of the objection or motion directly with the trial court."  See ch. 2013-216, § 8, Laws of Fla.  The corresponding portion of rule 3.852 states:

> Any objections or motions to compel production of public records pursuant to this rule shall be filed within 30 days after the end of the production time period provided by this rule.  Counsel for the party objecting or moving to compel shall file a copy of the objection or motion directly with the trial court.  The trial court shall hold a hearing on the objection or motion on an expedited basis.

Fla. R. Crim. P. 3.852(*l*)(2) (emphasis supplied).  Both the time requirement for filing objections or motions and the mandate that the trial court hold a hearing on any such objection or motion are absent from the statute.

Finally, subsection (9)(b) of the amended statute, titled "Limitation on Postproduction Request for Additional Records," states: "The trial court may order a person or agency to produce additional public records only upon a finding that [the listed requirements are met]."  See ch. 2013-216, § 8, Laws of Fla.  The corresponding portion of rule 3.852 states: "Within 30 days after the affidavit of collateral counsel is filed, the trial court may order a person or agency to produce additional public records only upon finding each of the following . . . ."  Fla. R.

Crim. P. 3.852(i)(2) (emphasis supplied). The statute does not contain the time period in which the order must be issued.

The language of rule 3.852 that is omitted from the amended statute governs the timeline and procedure for production of records, requires courts to hold certain hearings, and establishes a deadline for the issuance of an order on the production of records. We stated in Allen that these types of procedures that govern the production of public records in capital cases are procedural in nature and are, therefore, within the exclusive province of this Court. 756 So. 2d at 62, 64. However, simply because the Legislature has enacted legislation that touches upon a subject matter that is procedural in nature does not automatically render that statute unconstitutional. Here, the Criminal Justice Subcommittee of the House of Representatives published an analysis of the Act, which indicates that the Legislature was aware that portions of the rule were intentionally excluded from the amendment to the statute. In that analysis, the Criminal Justice Subcommittee noted that, "[t]he portions of the Rule that are procedural in nature are not codified in s. 27.7081, F.S." H.R. Subcomm. on Crim. Justice, Final Bill Analysis, H.R. 7083, at 5 n.41 (June 24, 2013). The Subcommittee also explained that the "bill amends s. 27.7081, F.S., to codify the majority of Rule 3.852 of the Florida Rules of Criminal Procedure, relating to the production of public records in capital postconviction proceedings." Id. at 5. Furthermore, the State, in its brief,

recognized that while the statute does not provide for hearings or requests for supplemental records, "this Court's rule provides that hearings can be held and that supplemental records can be requested, and the statute does not preclude or prohibit these additional procedures."

Thus, although the statute applies to the same subject matter as rule 3.852 but omits procedural provisions contained in the rule, we conclude that the amended statute does not unconstitutionally encroach upon the exclusive authority of this Court to adopt rules of practice and procedure in the courts of this State. The statute here does not attempt to regulate the procedure for public records production in capital cases in a manner that is inconsistent with this Court's rules. See Allen, 756 So. 2d at 66 (holding certain provisions of the DPRA related to public records unconstitutional with the exception of one section that was "consistent with our proposed rules"). Instead, the amended statute is consistent with rule 3.852, but simply omits some procedures contained in the rule. To the extent that the Act omits procedural rights provided in rule 3.852, the rules of procedure established by this Court govern. Therefore, we conclude that section 27.7081 does not violate article II, section 3, of the Florida Constitution because it neither abrogates procedural rules, nor does it encroach upon this Court's authority to adopt rules of practice and procedure.

**Section 27.703(1): Conflict of Interest and Substitute Counsel**

In their final constitutional challenge, the Petitioners allege that amended section 27.703(1) requires an attorney to disclose certain confidential information that this Court has prohibited from disclosure pursuant to its ethical code of rules of professional conduct. Accordingly, the Petitioners contend, the Act violates the separation of powers clause because it encroaches upon this Court's responsibility to regulate the conduct and discipline of attorneys vested exclusively in this Court pursuant to article V, section 15, of the Florida Constitution.

The Act amends section 27.703(1) to state, in relevant part:

> If, at any time during the representation of a person, the capital collateral regional counsel alleges that the continued representation of that person creates an <u>actual</u> conflict of interest, the sentencing court shall, upon determining that an actual conflict exists, designate another regional counsel. . . . An actual conflict of interest exists when an attorney actively represents conflicting interests. A possible, speculative, or merely hypothetical conflict is insufficient to support an allegation that an actual conflict of interest exists.

Ch. 2013-216, § 5, Laws of Fla. (emphasis supplied). This statutory modification reflects that the Legislature intended to define and impose a more stringent conflict standard than that of the prior version of the statute, which required only that CCRC not accept an appointment that created <u>a conflict</u> of interest. <u>See</u> § 27.703, Fla. Stat. (2012). Further, the amended statute places the responsibility of determining whether an actual conflict exists on the court. The prior version of the statute required the court to appoint substitute counsel once the regional counsel of record determined that a conflict existed. <u>Id.</u>

- 40 -

This Court has the inherent authority to adopt and enforce an ethical code of professional conduct for attorneys. See In re The Florida Bar, 316 So. 2d 45, 47 (Fla. 1975) ("The authority for each branch to adopt an ethical code has always been within the inherent authority of the respective branches of government. . . . The judicial branch has . . . a code of professional responsibility for lawyers, and, in addition, has the procedure to interpret them and the authority to enforce them . . . ."). The Legislature, therefore, is without authority to directly or indirectly interfere with an attorney's exercise of his or her ethical duties as an officer of the court. See Times Pub. Co. v. Williams, 222 So. 2d 470, 475 (Fla. 2d DCA 1969), overruled in part by Neu v. Miami Herald Pub. Co., 462 So. 2d 821, 825 (Fla. 1985). A statute violates the separation of powers clause when it interferes with the ethical duties of attorneys, as prescribed by this Court.

Rule Regulating the Florida Bar 4-1.6(a) states that a "lawyer shall not reveal information relating to representation of a client except as stated in subdivisions (b), (c), and (d), unless the client gives informed consent." This rule has been interpreted to protect the confidences and secrets of clients. See Buntrock v. Buntrock, 419 So. 2d 402, 403 (Fla. 4th DCA 1982). While the scope of the duty of confidentiality is broad, it does not protect all information regarding a client. Rather, an attorney may generally disclose the identity of a client or the generalities of a conflict without disclosing confidential information or violating

the duty of confidentiality. See Dean v. Dean, 607 So. 2d 494, 495 (Fla. 4th DCA 1992) (noting that traditionally the identity of a client has not been protected); cf. The Florida Bar v. Lange, 711 So. 2d 518, 519 (Fla. 1998) (stating "the referee found that respondent should not have divulged privileged attorney-client communications, but rather should have advised the court, in generalities, of this potential conflict . . . .").

Further, the United States Supreme Court has contemplated the disclosure by attorneys of a certain amount of non-confidential information to assist courts in evaluating the legitimacy of an asserted conflict of interest. In Holloway v. Arkansas, 435 U.S. 475, 485 (1978), the Supreme Court held that courts should grant a motion for appointment of separate counsel based on an assertion by the attorney that his or her continued representation would create a conflict of interest. ("[M]ost courts have held that an attorney's request for the appointment of separate counsel, based on his representations as an officer of the court regarding a conflict of interests, should be granted."). The Supreme Court held, however, that its ruling did not "preclude a trial court from exploring the adequacy of the basis of defense counsel's representations regarding a conflict of interests without improperly requiring disclosure of the confidential communications of the client." Id. at 487. The holding in Holloway demonstrates that an attorney can inform an

inquiring court of the basis for a conflict of interest without disclosing confidential information.

Additionally, we recently evaluated a statute similar to amended section 27.703(a) in <u>Johnson v. State</u>, 78 So. 3d 1305 (Fla. 2012). In <u>Johnson</u>, we addressed the issue of whether sections 27.5303(1)(a)[7] and 27.511(8),[8] Florida Statutes (2008), authorize appellate courts to inquire into the adequacy of the conflict of interest. 78 So. 3d at 1308. In determining that section 27.5303(1)(a)

---

7. In relevant part, section 27.5303(1)(a), Florida Statutes, provides:

If, at any time during the representation of two or more defendants, a public defender determines that the interests of those accused are so adverse or hostile that they cannot all be counseled by the public defender or his or her staff without conflict of interest . . . then the public defender shall file a motion to withdraw and move the court to appoint other counsel. The court shall review and may inquire or conduct a hearing into the adequacy of the public defender's representations regarding a conflict of interest without requiring the disclosure of any confidential communications. The court shall deny the motion to withdraw if the court finds the grounds for withdrawal are insufficient or the asserted conflict is not prejudicial to the indigent client. . . .

§ 27.5303(1)(a), Fla. Stat. (2008).

8. In relevant part, section 27.511(8), Florida Statutes, provides:

If the public defender certifies to the court that the public defender has a conflict consistent with the criteria prescribed in s. 27.5303 and moves to withdraw, the regional counsel shall handle the appeal, unless the regional counsel has a conflict, in which case the court shall appoint private counsel pursuant to s. 27.40.

§ 27.511(8), Fla. Stat. (2008).

governs all motions to withdraw filed by the public defender based on conflict at both the trial and appellate level, we noted that

> [t]he amended statute provides for the court to review the adequacy of the public defender's representations as to conflict and to inquire further, if necessary. . . . In fact, the court is specifically charged with reviewing the motion and making a determination of whether the asserted conflict is prejudicial to the client.

Id. at 1312. Although we did not specifically address whether such disclosure by the public defender implicated the duty of confidentiality in Johnson, the decision demonstrates that similar statutory provisions exist to permit or require courts to determine whether a conflict of interest is present, and that there is no evidence that such statutes have required an attorney to violate his or her ethical duties with respect to confidentiality. Furthermore, while section 27.703(1) does not contain the limiting language of section 27.5303(1)(a), which explicitly protects confidential communications, amended section 27.703(1) can and must be logically interpreted to require an attorney to make only those disclosures that are required to identify to the court that he or she "actively represents conflicting interests" without divulging confidential communications.

Thus, the Petitioners have failed to demonstrate that this statute cannot be read to operate in a way that does not interfere with the constitutionally delineated authority of this Court to regulate the ethical conduct of attorneys. See City of Gainesville, 918 So. 2d at 256. Accordingly, we conclude that amended section

- 44 -

27.703(1) on its face does not violate article II, section 3, of the Florida Constitution because it does not require the disclosure of confidential information in violation of rule 4-1.6 of the Rules Regulating the Florida Bar.

**CONCLUSION**

For the reasons expressed in this opinion, we conclude that the challenged provisions of the Timely Justice Act do not facially violate the constitution.

It is so ordered.

POLSTON, C.J., and PARIENTE, CANADY, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., concurs with an opinion in which LABARGA and PERRY, JJ., concur.
QUINCE, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

I join the majority opinion in concluding that none of the challenged provisions of the Timely Justice Act of 2013 facially violate the Florida Constitution. I write separately only to emphasize that nothing within the Act alters or affects this Court's solemn responsibility to issue a stay of execution if required to ensure adequate and complete judicial review of a defendant's claims alleging a violation of his or her constitutional rights.

As noted by the State in its response to the petition, this Court is still constitutionally entrusted with the duty to issue a stay of execution if there is a

meritorious postconviction claim pending or, if at the time the warrant is signed, the defendant brings a successive postconviction challenge that casts doubt on his or her guilt, the integrity of the judicial process, or the validity of the death sentence imposed. See Response to Emergency Petition for Extraordinary Relief at 28, Abdool v. Bondi, No. SC13-1123 (Fla. July 18, 2013) ("[T]he inherent power of the judiciary to grant a stay of execution where necessary can protect any litigants from being denied adequate judicial review of a cognizable claim. Therefore, facial invalidity of the statute is not demonstrated by speculation of a potential unconstitutional application of the Act."). In my view, that remains the essential fail-safe mechanism this Court may utilize when necessary to ensure that the ultimate punishment of the death penalty is inflicted in a manner that fully comports with the Constitution.

Indeed, although rare and undertaken with the utmost of thoughtful review, this Court has granted relief to death-sentenced defendants bringing successive postconviction claims when newly discovered evidence establishes, perhaps even decades after the crime, that "the totality of the evidence is of 'such nature that it would probably produce an acquittal on retrial' because the newly discovered evidence 'weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.' " Swafford v. State, 125 So. 3d 760, 762-63 (Fla. 2013) (quoting Jones v. State, 709 So. 2d 512, 523, 526 (Fla. 1998)). It is

not unprecedented, in fact, for relief to be granted even after a death warrant is signed.

For example, in Johnson v. State, 44 So. 3d 51, 56 (Fla. 2010), this Court reviewed the denial of a death-sentenced defendant's second successive motion for postconviction relief, which was pending on appeal in this Court at the time his death warrant was signed. This Court issued a stay of execution to consider Johnson's successive postconviction claim, which was based on newly discovered evidence showing that the prosecutor "knowingly used false testimony and misleading argument to convince the court to admit" evidence that the prosecutor knew was inadmissible. Id. at 53. We held that "[t]he prosecutor's misconduct obfuscated the truth-seeking function of the court and compromised the integrity of the subsequent proceedings," therefore requiring the death sentences to be vacated based on Giglio v. United States, 405 U.S. 150 (1972). Johnson, 44 So. 3d at 53-54. Reversal of the death sentences in Johnson was "the only option available to this Court" to ensure that the defendant was not executed after his constitutional rights to due process and a fair trial were violated. Id. at 54.

Recent cases such as Johnson and Swafford demonstrate this Court's commitment to thorough judicial review of death penalty cases throughout the course of proceedings, even after a death warrant has been signed, and even though we ultimately reject the vast majority of successive postconviction claims that

come before us.  In practice, the Governor is cognizant of this Court's role in ensuring that the defendant has had every opportunity to litigate any potentially meritorious claims, and generally refrains from signing a death warrant for any inmate who is actively engaged in litigation that may cast doubt on the validity of the conviction or sentence.[9]

I am confident that, as has already been the case after the Act took effect in July 2013, the implementation of the Act will not affect this Court's ability to review any claims either pending at the time of, or raised after the issuance of, a death warrant.  If a defendant believes that his or her constitutional rights have been violated or that complete judicial review has not occurred, there is certainly nothing in this Court's opinion upholding the facial constitutionality of the Act in this case that precludes a defendant from raising an as-applied constitutional

---

9. In fact, the vast majority of the death warrants signed over the last several years have been for defendants who did not have any active litigation or postconviction motions pending at all, including John Henry, Robert Hendrix, Robert Henry, Juan Chavez, Darius Kimbrough, William Happ, and numerous others.  Although many of these inmates filed claims subsequent to the issuance of the warrant, generally the claims presented have concerned challenges to the lethal injection protocols or other purely legal issues that do not cast doubt on the defendant's guilt or on the integrity of the judicial process.  See, e.g., Chavez v. State, 132 So. 3d 826 (Fla.) (challenging the lethal injection protocol, the denial of public records requests, and the sufficiency of clemency proceedings), cert. denied, 134 S. Ct. 1156 (2014); Kimbrough v. State, 125 So. 3d 752 (Fla.) (presenting the single claim that Florida's death penalty statute violates the Eighth Amendment), cert. denied, 134 S. Ct. 632 (2013).

challenge to the validity of the Act, and there is nothing in the Act that prevents this Court from issuing a stay of execution if necessary.

LABARGA and PERRY, JJ., concur.

Original Proceeding – All Writs

Neal Andre Dupree, Capital Collateral Regional Counsel – South, and M. Chance Meyer, Staff Attorney, Ft. Lauderdale, Florida; James V. Viggiano, Jr., Capital Collateral Regional Counsel – Middle, Tampa, Florida; Martin J. McClain and Linda McDermott of McClain & McDermott, P.A., Wilton Manors, Florida; and Terri L. Backhus of Backhus & Izakowitz, P.A., Tampa, Florida,

     for Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, Florida,

     for Respondents